(No. 7120.   October 6, 1943.)

UTILITIES ENGINEERING INSTITUTE, a corporation, Appellant, v. J. W. CRIDDLE, Respondent.

[141 Pac. (2d) 981.]

202

H. W. Soule and A. H. Wilkie for appellant.

Alvin Denman for respondent.

BUDGE, J.—This is an action on a contract of guaranty. Briefly stated, the material facts are substantially as follows: On July 8, 1938, Linden G. Criddle, aged 16, upon solicitation by one Cole, traveling salesman and representative of appellant, signed an application for enrollment as a student in appellant's correspondence school for a course in electrical refrigeration and air conditioning. Said application was mailed to and accepted by appellant at its place of business in Chicago, Illinois. Thereafter approximately 36 lessons on the subject of electrical refrigeration were forwarded to and received by Linden G. Criddle, who completed about 22 lessons but due to lack of finances he was unable to continue with his course. There was some correspondence between appellant and Linden G. Criddle looking to some sort of arrangement whereby the lessons were to be discontinued, which ultimately resulted in a discontinuance of the course. Linden G. Criddle paid $10 at the time he signed the application and thereafter paid $30 more on the total sum of $197.50, being the full amount to be paid. At the time he signed the application referred to, his father, J. W. Criddle, respondent, signed the following guaranty: "If Applicant is Under 21, A parent, Guardian Or other

Responsible Adult Must Sign Below: For value received, I, the undersigned, hereby approve this application and assure payment of the tuition fee above mentioned, FULL NAME— J. W. CRIDDLE."

Appellant commenced this action in the Justice Court of Idaho Falls precinct, Bonneville County, against Linden G. Criddle, and his father, J. W. Criddle, alleged guarantor, to recover the balance due, namely $157.50, legal interest thereon, and for costs of suit; which resulted in judgment in favor of defendants in said action, from which judgment appellant appealed to the District Court of the Ninth Judicial District. In the District Court, respondent demurred to appellant's amended complaint upon the ground of a misjoinder of parties defendants. The demurrer was sustained and appellant filed a second amended complaint dismissing its cause of action against Linden G. Criddle, a minor, who had repudiated the contract and, as it is alleged in appellant's second amended complaint, "cannot be held personally responsible under said contract for the reason that he is a minor." Whereupon respondent filed a second amended answer to appellant's second amended complaint. Upon the issues thus framed the cause was tried to the court and jury. Verdict was rendered for respondent and judgment duly entered thereon from which judgment this appeal is prosecuted.

Concisely stated, respondent's defense to this action is that his signature guaranteeing payment of the tuition as stipulated in the application was procured by the fraudulent representations of appellant's agent. If the signature of respondent was obtained by misrepresentations and fraud inherent in the contract, the contract is void, which, if true, make other assignments of error urged in appellant's brief unimportant.

We therefore come to the question of whether or not the evidence is sufficient to establish the fact that the signature of respondent was fraudulently obtained. It is established without contradiction that Cole, agent of appellant, represented to respondent that he had procured part-time employment for his son at Montgomery Wards and Auto Parts, business houses located in Idaho Falls, and that the son would make enough by reason of such employment to pay the installments as they became due; that respondent relied upon these representations which were false and made with the intention of fraudulently procuring the signature

of respondent to the contract of guaranty. It was a false and fraudulent misrepresentation made with reference to the subject-matter of the contract, and was as to an existing fact. J. W. Criddle, respondent, was asked and made answer to the following questions:

"A. He had the boy quite enthused about it, and so he said he was coming back in—I think it that—that it was that night; and so he came back after I was home, and made me all these promises. He said that was part of his job was to come through here every six weeks—he had students all along the line here, in every town, and that was part of his job to come through here every six weeks, and give them help with anything that they needed help on. *And he said he had made arrangements for part time work at several different places here after he had completed so many lessons* —I think it was around twenty or twenty-two,—so that he could make his payments. I told him that I couldn't help him, because I had the five boys, and just about all we could do to provide for them, and didn't have any six dollars a month to pay for anything like that. He says, 'There's no liability to it. It's just a matter of form * * * that you sign as a sponsor.' So, that's all there was to it; there wasn't any comeback or any liability on my part. But, he never did show up, never from the time he was here, and he has never been in Idaho Falls since, so far as I can find out. Of course, he had no intention of coming when he told us that. Just a scheme to get us to sign with the boy. (Italics ours.)

"Q. Now, Mr. Criddle, did he represent to you at the time you signed this contract *that he already had made arrangements in town* with any places for work for the boy, Linden? (Italics ours.)

"A. Yes, he did.

"Q. Do you remember where?

"A. Well, one he spoke of was Montgomery Ward's and I think Auto Parts was one. I don't remember. He mentioned four different places; I just don't remember the other two.

"Q. Did you make inquiry at Montgomery Ward's thereafter to find out what the fact was?

"A. The boy went down there after he completed this first part, and asked for a job, and told them what Mr.

Cole had told him. And they said, 'Well, we never heard of Mr. Cole, and so far as we know, there is no such man'; and that he had never been there, at all. And he told us that he had been, and had arrangements all made for these students to receive part time work at different places."

All of the above testimony was admitted without objection. The following questions were asked respondent by the court:

"Q. I didn't get clear in mind your testimony with respect to the statement made by Mr. Cole. You said he told you that he had made arrangements at Montgomery Wards

"A. Yes sir; there was four different places—

"Q. —and some other places—

"A. Four places here in town.

"Q. —for employment for the—

"A. For his students that he had in Idaho Falls.

"Q. For his students?

"A. Yes.

"Q. I want you to say now whether or not that was before, or after, you signed this contract?

"A. That was before. He said he had made arrangements with four different places here to handle the students, if he could get that many. Montgomery Ward's said they had their own service men, and had had for a long time, and didn't even know there was such a man as Mr. Cole."

Mrs. J. W. Criddle, mother of Linden G. Criddle, was called as a witness and among other things testified:

"Q. In nineteen hundred and thirty-eight do you remember Mr. Cole coming to your place, either the store, or out to the house, in connection with your son taking a course from the Utilities Engineering Institute?

"A. He came to the store one day and talked to me, yes, in connection with it. I told him the situation, that the little boys and I had everything to do that was being done, practically, at that time, and told him if Linden took any course he would have to provide for the payment of it, and he said that he would do so. He said it wasn't only necessary—after he finished this first group of lessons that it was necessary for him to have practical work in order to continue the course, as well as to have money to pay for the course, it was necessary for him to have practical exper-

ience to answer the questions. * * * we were given to understand that he would have to have practical experience to answer those. * * *

"Q. Thereafter did he come out to the house and have a talk about there—talk about it there with you?

"A. He did, when we were both present, and he said that one of us would have to sign, as a mere matter of formality, because the boy wasn't of age.

"Q. What, if anything, was said about part time work in meeting those payments, Mrs. Criddle, at that time?

"A. He said that as soon as he had finished the first group of lessons that he had made arrangements here in town to secure part time work for him; that arrangement—for all of his students. He said that arrangements was already made, and that he would be back here to take care of it, but he never came back. He couldn't go on unless he had practical experience, and couldn't go on unless he had the money to pay for the lessons.

"Q. And he did neither?

"A. Neither one at that time.

* * *

"Q. You have never seen Mr. Cole since?

"A. No, he never showed up here again?"

The deposition of Linden G. Criddle was taken by agreement and introduced upon the trial by appellant. Among other things the deposition discloses the following questions and answers propounded to and answered by Linden G. Criddle:

"Q. Why did you cease studying?

"A. Because of financial difficulties.

"Q. Was that occasioned because Mr. Cole did not get you the employment as he had promised?

"A. Yes.

* * *

"Q. Why did you discontinue payment, and discontinue studying?

* * *

"A. When they refused to postpone sending the lessons, I could not keep up the payments on account of financial difficulties because Mr. Cole did not keep his part of the agreement."

It is strenuously contended by appellant that if it be conceded that false and fraudulent representations were made as disclosed by the evidence, relied upon and believed to be true by guarantor, respondent, and by him acted upon, nevertheless appellant is not bound for the reason that they were oral agreements or promises made to respondent by appellant's agent, which were not within the scope of the agent's authority. In support of said contention reference is made to the application containing the following language: "I have read this agreement fully and understand its contents clearly. For our mutual protection, I agree that this is the entire understanding between us and that no written alteration or verbal agreements supplementing this contract shall be recognized."

We think the rule is well settled that where an agent has authority to sell a contract, he acts within the scope of his authority when he makes fraudulent representations as an inducement to make the sale. (*Schuster v. N. A. Hotel Co.*, 106 Neb. 679, 186 N.W. 87; *Advance-Rumely T. Co., Inc., v. Jacobs*, 51 Ida. 160, 4 P. (2d) 657.) It was stipulated upon the trial that Cole was the "representative of the company for the purpose of selling this contract but no further." Whatever representations the agent made as a representative of the company for the purpose of selling the contract and as an inducement to secure respondent's signature as guarantor were within the scope of his authority. As is said in *Schuster v. N. A. Hotel Co.*, supra:

"It is quite generally held that a provision in a contract, to the effect that the agent cannot bind the company by any representations, statements or agreements, will not relieve the principal from responsibility for the fraudulent representations, as to the subject-matter of the contract, made by the agent, since such representations are within the scope of the agent's actual or ostensible authority."

In *Land Finance Corp. v. Sherwin Electric Co.*, 102 Vt. 73, 146 At. 72, 75 A.L.R. 1030, it is held:

"Having authorized the agent to speak, the company is liable for his fraud and deceit, if he spoke falsely, irrespective of the limitation as to its contractual liability."

The rule in this jurisdiction is announced in *Advance-Rumely T. Co., Inc. v. Jacobs*, supra, as follows:

" 'There is a line of authorities holding that it is competent for parties to enter into a contract stating that no

representation, agreement or promise has been made except those stated in the contract and that if the contract contains such a promise the stipulation is enforceable and will bar a suit for rescission because of any antecedent fraudulent representation, agreement or promise not contained in the written contract. * * * The ground for decision in those cases seems to be that where parties have made a definite agreement in which they state that no representations have been made other than those contained in the contract that the contract as made, should be enforced in order that the relations arising from it should be certain and definite and that to permit parol testimony to show prior representations, after the parties had stipulated that there were no such representations, would defeat the purposes of the contract and contradict its very terms, and therefore that parol evidence of antecedent fraud or fraud which entered into the inception of the contract and not into its execution is inadmissible, although if it entered into the execution of the contract it is admissible. *This doctrine has not been followed by a majority of the courts of equal authority and it not the rule in England or in most of the states and has not received the support of the leading text writers in this country.* The majority of the decisions state the rule to be that if a contract is induced by fraud, whether the fraud enters into the execution of the contract or is antecedent to it, the contract cannot stand regardless of any stipulation to the contrary contained in the contract, and that, if the effect of the stipulation is such that it amounts to a waiver of fraud practiced on the complainant and which induced him to enter into the contract, this clause is of no effect because being against public policy and because allowing the guilty party to profit by his own wrong, and denying the application of the principle that fraud vitiates any contract.' " (Citing many cases.)

Appellant also contends that to permit admission in evidence of oral agreements made by the agent prior to obtaining the signature of the guarantor that he had procured employment at Montgomery Ward's and elsewhere for Linden G. Criddle, was an attempt to vary and change the terms of the written instrument by parol evidence. The parol evidence rule has nothing to do with a case where the defense is fraud in procuring the agreement. In such a case the theory is that because of fraud there was no contract. (*Arnold v. National Aniline & Chemical Co.*, 20 F.

(2d) 364, 56 A.L.R. 4, annotation, p. 13; *Land Finance Corp. v. Sherwin Electric Co.*, supra.)

▮ Appellant assigns the insufficiency of the evidence to support the judgment upon the ground that the only evidence of any damage resulting to respondent is that given by him when he testified as to the question of damages sustained: "Yes, it has cost me an attorney's fee for two trials." This testimony was admitted without objection. We think the rule to be that any damage or injury however slight shown to have been sustained by guarantor is sufficient. (28 C.J. 1171.)

▮ In appellant's reply brief it is suggested that the course on domestic refrigeration consisted of 53 lessons and that Linden G. Criddle did not complete more than 30, probably 22, and not having completed the lessons on the subject, the guarantor was not in a position to interpose the defense of fraud based upon the theory that employment for Linden G. Criddle had not been definitely arranged for. No arrangement for employment had been made, and the statements to the contrary were false and fraudulent and made for the purpose of procuring the signature of respondent to the contract of guaranty. So it would have made no difference whether Linden G. Criddle had completed the course or not.

No reversible error appearing in the record, it follows the judgment must be affirmed and it is so ordered. Costs to respondent.

Holden, C.J., and Ailshie, Givens, and Dunlap, JJ., concur.