541 P.2d 1184

**GLENN DICK EQUIPMENT CO., an Idaho Corporation, Cross Complainant, Respondent-Cross Appellant,**

v.

**GALEY CONSTRUCTION, INC., an Idaho Corporation, Cross Defendant, Appellant-Cross Respondent.**

**GALEY CONSTRUCTION CO., INC., an Idaho Corporation, Counter Claimant, Cross Claimant, Appellant-Cross Respondent,**

v.

**GLENN DICK EQUIPMENT CO., an Idaho Corporation, Cross Defendant, Counter Defendant, Respondent-Cross Appellant.**

**No. 11427.**

Supreme Court of Idaho.

Oct. 8, 1975.

Paul T. Baird of Clemons, Cosho, Humphrey & Samuelsen, Boise, for appellant-cross respondent.

Donald W. Lojek of Moffatt, Thomas, Barrett & Blanton, Boise, for respondent-cross appellant.

McFADDEN, Justice.

Glenn Dick Equipment Company, as lessor, and Galey Construction Company, as lessee, entered into a contract for the lease of three motor scraper units owned by Glenn Dick Equipment Company. After extended legal proceedings, judgment was entered awarding Glenn Dick Equipment Company damages, interest, attorney fees, and costs. Galey Construction Company appeals from the judgment and Glenn Dick Equipment Company cross appeals. We affirm.

The lease at issue involves the rental of three motor scraper units to Galey Construction Company. The motor scraper units are pieces of heavy construction equipment used on road construction projects to haul fill dirt; the units consist of motor units and scraper bowl units. Glenn Dick Equipment Company (hereinafter, Dickco), the owner of the units, is a corporation whose primary business is the sale and lease of heavy construction equipment;

the principal officers of Dickco are Glenn Dick, Kaye Dick and Yale Dick.

Dickco mailed to Galey Construction Company (hereinafter Galey), a corporation whose primary business is heavy construction, a flyer describing the three units and offering them for sale. Galey, needing the scraper units for a road construction job near Baker, Oregon, entered into negotiations with Dickco for lease of the units. The lease, dated June 25, 1971, provided for the lease of the three units for the term of July 1, 1971, to August 31, 1971, at an aggregate rent of $18,000—$9,000 was payable in advance and $9,000 was due on August 1, 1971. The lease gave the lessee, Galey, the option to purchase the three units for $58,800 payable August 31, 1971. According to the lease, the lessee (Galey) was obligated to "keep the equipment in good repair, condition and working order" and the lessor (Dickco) disclaimed all warranties, express or implied. Galey paid the advance rental. On June 28, 1971, Dickco assigned its rights under the lease to the Idaho Bank and Trust Company.

One unit (hereinafter, unit # 8) was located at Dickco's yard in Boise and Galey took delivery of the unit there. Unit # 8 was transported to the Baker jobsite, arriving June 28. At the jobsite, Galey's employees examined unit # 8 and found that the unit's transmission and hydraulic system needed repairs and that the tires were in poor condition.

The other two units (units # 6 and 7) were located in Reno, Nevada; Galey took delivery of these in Reno and transported them to Boise in early July. When these units arrived in Boise, Galey discovered that the machines had mechanical problems; several meetings between Frank Galey, president of Galey Construction Company, and employees of Galey and Glenn Dick, Kaye Dick, and Yale Dick were held to discuss the mechanical problems. The trial court found that, during these discussions, an oral modification of the lease agreement was entered into whereby the parties agreed that the lease period would not begin to run on units # 6 and 7 until they reached the Baker jobsite and that Galey would make the necessary repairs and charge those repairs against the second month's rental of $9,000.

Unit # 7 was transported to the Baker jobsite on July 19 and unit # 6 arrived at the jobsite July 22. At the jobsite, Galey experienced serious mechanical problems with the units including problems with the transmissions, torque converters, hydraulic systems, and tires. Galey's project superintendent on the Baker job testified that lost time on units # 6, 7 and 8 was 84% whereas lost time on similar motor scraper units owned by Galey and used on the same haul was 4%. Galey alleges that it spent $11,725.04 for repairs.

Units # 6 and 7 were returned to Boise in mid-September and Dickco picked up these units on September 27, 1971. Galey transported unit # 8 to a jobsite near Jordan Valley in Owyhee County, where the unit was used until Dickco repossessed the unit October 5, 1971.

This action was precipitated by the filing of a complaint by the Idaho Bank & Trust Company against Glenn Dick, Dickco, and Galey, seeking to foreclose on the bank's security interest in the three units and other relief. Dickco instituted a cross-claim against Galey and Galey filed a counterclaim against the bank and a cross-claim against Dickco. Pursuant to a stipulation of the parties, the district court entered judgment for the bank against Glenn Dick and Dickco, and dismissed with prejudice the bank's claim against Galey and Galey's counterclaim against the bank.

The action was tried to the district court sitting without a jury as to the cross and counterclaims of Dickco and Galey. Dickco sought damages for rental, repair costs, and other items on an open account, damages for wrongful possession of the units beyond the lease term, punitive damages, and other relief. Galey, alleging that the scraper units were defective, that the lease had been modified, and that Dickco's

repossession was wrongful, sought possession of the units for six months or, in the alternative, damages, and damages for breach of warranty. Judgment was entered against Galey for damages in the amount of $3,500 plus interest for the wrongful retention of unit # 8, for attorney fees in the amount of $6,757.29, and for costs. Galey appeals and Dickco cross-appeals from the judgment. Since the issues raised by Galey's appeal are central to resolution of this case, Galey's appeal will be considered first.

Galey's assignments of error focus on the following issues—the extent of an oral modification of the written lease agreement; the admissibility of certain evidence relevant to Galey's allegation that Dickco fraudulently misrepresented the machines; the trial court's finding of fact that no fraudulent representations were made by Dickco; the creation of express and implied warranties and Dickco's disclaimer of these warranties; and the trial court's interpretation of certain provisions contained in the written lease agreement.

The threshold issue raised by this appeal is whether Article 2 of the Uniform Commercial Code (I.C. § 28–2–101 et seq.) should be extended to this lease transaction.[1] Before discussing the issues pertaining to Article 2, we will review Galey's assignments of error directed to the modification of the contract.

■ Galey argues that the following finding of fact was in error.

"A subsequent oral modification of the written Lease Agreement was effected in that the parties agreed that the lease payments would not begin to run on the two scrapers referred to as No. 6 and No. 7 until said equipment was actually at the job site in Oregon and that Galey would make necessary repairs to the equipment prior to the delivery to the job site and that such repairs could be charged against the second month's rental for the lease of this machinery."

Galey submits that the finding was in error because the parties entered into a modification of the contract whereby the costs of repairs would be charged against the second month's rental with Dickco assuming the repair costs in excess of the second month's rental and the rental period for units # 6 and 7 would begin when the machines were operable rather than when the machines arrived on the Baker jobsite. Dickco does not contest the trial court's finding that the parties entered into an oral modification of the written lease agreement; thus, the only issue this court will consider is the extent of the modification, i. e., whether the contract modification included additional terms not delineated in the trial court's finding of fact. A review of the record indicates that this finding of fact is supported by substantial competent, although conflicting, evidence; we will not disturb the finding on appeal. *Enders v. Wesley W. Hubbard & Sons, Inc.,* 95 Idaho 908, 523 P.2d 40 (1974). Thus, the contract between the parties consists of the oral modification as found by the trial court and those portions of the written lease agreement not in conflict with the oral modification.

Generally, questions regarding the applicability of Article 2 to a lease have arisen in the area of implied warranties. Cases which have found Article 2, or at least, the implied warranty provisions, to be applicable to a lease have employed at least three different rationales. Some courts have concluded that Article 2 is directly applicable to a lease because a lease is within the scope of Article 2 as it is a transaction in goods.[2] See, I.C. § 28–2–102. Other

---

1. Although the trial court failed to make a specific ruling as to whether Article 2 was applicable to the transaction, arguments at trial and the findings of fact and conclusions of law indicate that the trial court considered Article 2 to be applicable to this lease.

2. *In re Vaillancourt,* 7 U.C.C.Rep.Ser. 748 (D.Ma., 1970) ; *Owens v. Patent Scaffolding Co.,* 77 Misc.2d 992, 354 N.Y.S.2d 778 (N.Y. Sup.Ct.1974). See, *Fairfield Lease Corp. v. George Umbrella Co., Inc.,* 8 U.C.C.Rep.Ser. 184 (N.Y.Civil Ct., 1970) ; *Hertz Commer-*

courts have concluded that the specific lease was analogous to a sale of goods and so have found that the lease was subject to Article 2.[3] These courts have examined the facts of the transaction at issue to analyze whether the the contract provides an option to purchase or to extend the lease for nominal consideration, who has the duty to repair, and other factors; if a court found that the lease transaction was actually a "disguised sale" then the court applied Article 2 provisions. Finally, other courts, comparing the economic considerations of leasing to a sale of goods, have concluded that certain provisions of Article 2 should be applied by analogy to lease transactions.[4] See, 48 A.L.R.3d 668 "UCC Warranty Provisions—Bailments" (1973).

This court has ruled that the implied warranty provisions of the Uniform Commercial Code (I.C. § 28–2–314, 315) should be extended by analogy "to the area of lease transactions *under appropriate circumstances*" (emphasis in original).[5] *All-States Leasing Co. v. Bass,* 96 Idaho 873, 877, 538 P.2d 1177, 1181 (1975). That case

involved the lease of a car wash system owned by All-States Leasing to Bass. The court found that the lessor's (All-States Leasing) participation in the transaction was as a financing agent; that is, the court found that All-States Leasing was a "finance lessor". The court ruled that I.C. § 28–2–314, providing for an implied warranty of merchantability, and I.C. § 28–2–315, providing for an implied warranty of fitness for a particular purpose, were applicable to the transaction but that, under the facts of the case, no implied warranties were created.

As this court has found that I.C. § 28–2–314, 315 should be extended by analogy to a lease transaction under appropriate circumstances, we must decide if this is a transaction where the circumstances are appropriate to extend the implied warranty provisions; moreover we must also decide whether certain other provisions of Article 2 should be applied to this transaction. Resolution of these issues requires us to formulate a rationale by which we can de-

*cial Leasing Corp. v. Transportation Credit Clearing House,* 59 Misc.2d 226, 298 N.Y.S. 2d 392 (N.Y.Civil Ct., 1969), rev'd on other grounds, 64 Misc.2d 910, 316 N.Y.S.2d 585. But see, *Computer Servicenters, Inc. v. Beacon Mfg. Co.,* 328 F.Supp. 653 (D.C.S.C. 1970).

3. *ASCO Mining Co., Inc. v. Gross Contracting Co., Inc.,* 3 U.C.C.Rep.Ser. 293 (Penn.Ct.Com. Pleas, 1965) ; *United States Leasing Corp. v. Franklin Plaza Apartments, Inc.,* 65 Misc. 2d 1082, 319 N.Y.S.2d 531 (N.Y.Civil Ct., 1971).

4. *KLPR TV, Inc., v. Visual Electronics Corp.,* 465 F.2d 1382 (8th Cir., 1972) ; *W. E. Johnson Equip. Co., Inc. v. United Airlines, Inc.,* 238 So.2d 98 (Fla.1970) ; *Sawyer v. Pioneer Leasing Corp.,* 244 Ark. 943, 428 S.W.2d 46 (1968). See, *Hawkins Const. Co. v. Matthews Co., Inc.,* 190 Neb. 546, 209 N.W.2d 643 (1973) ; *Smith v. Sharpensteen,* 13 UCC Rep.Ser. 609 (Okla.Ct.App., 1973) ; *Baker v. City of Seattle,* 79 Wash.2d 198, 484 P.2d 405 (1971) ; *Morris Plan Leasing Co., Inc., v. Bingham Feed and Grain Co., Inc.,* 259 Iowa 404, 143 N.W.2d 404 (1966) ; *Cintrone v. Hertz Truck Leasing, etc.,* 45 N.J. 434, 212 A.2d 769 (1965).

5. Regarding the approach that Article 2 is directly applicable to a lease, some courts

have found that a lease is a "transaction in goods" and so find that a lease is within the scope of Article 2. See I.C. § 28–2–102. However, Article 2 specifically defines "buyer", "seller", and "contract for sale" and specific provisions of Article 2 uses these terms. Thus, significant internal conflicts within Article 2 may be created by ruling that Article 2 applies directly to a lease. *Anderson,* 1 Uniform Commercial Code (2d ed.) § 2–102:4.1, cum. supp. p. 181 (1974).

Significant problems are also apparent with the second approach of examining the specific transaction to determine whether the transaction was a "genuine lease" or a "disguised sale". The primary criticism of this approach is the artificiality of the distinction between a "genuine lease" and a "disguised sale" for Article 2 purposes (although this distinction may be relevant for Article 9 purposes) ; the decision as to whether a lease is a sale may turn upon arbitrary considerations. See Note, "Warranties in the Leasing of Goods", 31 Ohio St.L.J. 140 (1970). Moreover, this approach tends to cloud the issue of the relationship of Article 2 to a lease transaction as the court must be concerned with the specific facts of the transaction without reference to the legal questions inherent in the case. See *Baker v. City of Seattle,* 79 Wash.2d 198, 484 P.2d 405 (1971).

termine whether a specific provision of Article 2 should be extended by analogy to a particular lease transaction. We begin by contrasting the concept of leasing to the concept of a sale of goods. In many respects, particularly when analyzed from the point of view of the parties to a lease, a lease transaction is analogous to a sales transaction.

> "Equipment leasing is a recent device whereby users of goods are enabled to have the sole and exclusive use thereof for such periods of time as are economically beneficial to them at advantageous costs. It has become a widely used substitute for purchase, * * *." *Hertz Commercial Leasing Corp. v. Transportation Credit Clearing House*, 59 Misc.2d 226, 298 N.Y.S.2d 392 (N.Y.Civ.Ct., 1969) *rev'd on other grounds*, 64 Misc. 2d 910, 316 N.Y.S.2d 585.

See, *Murray*, "Under the Spreading Analogy of Article 2 of the Uniform Commercial Code", 39 Fordham L.R. 447 (1970). The essence of both transactions is that the lessee/buyer seeks to acquire the right to use a good and the lessor/seller seeks to sell the right to use a good. In most instances, the specific means by which that right is acquired determines whether the transaction is a lease or a sale. On the other hand, there are significant differences between a lease and a sale including transfer of title, incidents of ownership, risk of loss, financial considerations, taxes, and bankruptcy proceedings. The comparison between a lease and a sale is further complicated when the great variety of lease transactions are considered.[6]

The analogies between a lease and a sale must be considered or else confusing legal conflicts between the two may appear.

"In view of the great volume of commercial transactions which are entered into by the device of a lease, rather than a sale, it would be anomalous if this large body of commercial transactions were subject to different rules of law than other commercial transactions which tend to the identical economic result." *Hertz Commercial Leasing Corporation v. Transportation Credit Clearing House,* supra, 298 N.Y.S.2d at 395. See, *Owens v. Patent Scaffolding,* 77 Misc.2d 992, 354 N.Y.S.2d 778 (N.Y.Sup. Ct.1974).

■ Reasoning by analogy does not require us to apply Article 2 in toto to a lease; rather, we need apply only those provisions which are sufficiently analogous. In order to determine which provisions are applicable, we will look to the commercial setting in which the problem arises and contrast the relevant common law with Article 2—we will use Article 2 as "a premise for reasoning only when the case involves the same considerations that gave rise to the Code provisions and an analogy is not rebutted by additional antithetical circumstances". Note, "The Uniform Commercial Code as a Premise for Judicial Reasoning", 65 Colum.L.Rev. 880, 888 (1965). See, *Baker v. City of Seattle,* 79 Wash.2d 198, 484 P.2d 405 (1971).

The first issue raised to which Article 2 provisions may be applicable is whether the trial court erred when the court ruled that certain parol evidence was not admissible under I.C. § 28–2–202. Galey argues that it was induced to enter into the written lease agreement because of the fraudulent representations made by Dickco. Galey concludes that the agreement was not the final and complete agree-

---

6. Some lease transactions are analogous to an installment contract for sale in that the lessee leases from a dealer specializing in sale and/or lease of a good, pays a rental charge equal to the value of the equipment leased and interest charges, and has an option to purchase at the expiration of the lease period. Other transactions may be equated with the "typical rental agreement" such as the rental of an automobile for one day from a company specializing in such rentals. In other transactions, the lessor may serve only as the financing agent for an item which the lessee has already selected for lease. See, Comment, "Finance Lessor's Liability for Personal Injuries", 1974 U. of Ill.L.J. 154.

ment of the parties because of the fraudulent representations. Testimony regarding these representations was excluded from evidence but Galey was permitted to submit an offer of proof pursuant to I.R.C.P. 43(c). The trial court found that the written lease agreement was the final and integrated agreement between the parties and that parol statements made prior to or contemporaneously with the agreement were barred by the parol evidence rule.[7]

I.C. § 28–2–202 provides:

"Final written expression—Parol or extrinsic evidence—Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented

\* \* \* \* \* \*

(b) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement."

This provision is not necessarily a statement of the parol evidence rule distinct from the common law; rather, the drafters of the code, with the section, intended to incorporate the common law relevant to the parol evidence rule unless the common law was specifically excluded.

"The Code does not expressly adopt the parol evidence rule except by its provision that when the writing is found by the court to have been intended as a complete and exclusive statement of the

terms, additional terms, although consistent, may not be added thereto. This provision is in harmony with the parol evidence rule and this fact, together with the provision that the prior law continues when not displaced [I.C. § 28–1–103], justifies the conclusion that the local parol evidence rule is applicable to transactions under the Code." 1 Anderson, Uniform Commercial Code (2d ed. 1970) § 2–202:14, p. 294.

*Accord,* White and Summers, Uniform Commercial Code, § 2–11 (1972). Thus, we do not have to reach the question of whether I.C. § 28–2–202 is applicable to this transaction as the common law relevant to the question of admissibility of parol evidence to show fraud in the inducement to enter into the contract is dispositive of the question regardless of whether I.C. § 28–2–202 is applicable.

■■ Case law is well settled in Idaho that parol evidence is admissible for the purpose of showing fraud. *Utilities Engineering Institute v. Criddle,* 65 Idaho 201, 141 P.2d 981 (1943); *Wollan v. McKay,* 24 Idaho 691, 135 P. 832 (1913). Galey claimed that it was induced to enter into the contract by Dickco's fraudulent representations and Galey offered evidence to prove the fraudulent nature of the representations. It was error to exclude in a court trial parol evidence offered to prove that Galey was induced to enter into the contract by Dickco's fraudulent misrepresentations.[8]

■ The trial court entered a finding of fact that there were no fraudulent representations made by any agent of Dickco which induced Galey to enter into the contract. As the only evidence offered to prove the fraudulent representations was

7. The transcript of the argument before the trial court suggests that the court relied on I.C. § 28–2–202.

8. For the purposes of this analysis, we are assuming that the written lease agreement was the final and integrated agreement between the parties. This assumption is open to

question as the parties entered into an oral modification of the written agreement which substantially altered the contractual rights and duties of the parties. Nevertheless, even if the written agreement is considered to be the final and complete agreement of the parties, it was error to exclude evidence relevant to the allegations of fraud.

excluded from the record we find this finding of fact to be unsupported by any evidence before the court. Findings of fact not supported by substantial, competent, although conflicting evidence must be reversed. See, *Enders v. Wesley W. Hubbard & Sons, Inc.,* 95 Idaho 908, 523 P.2d 40 (1974); *Schoenick v. Smalley,* 93 Idaho 786, 473 P.2d 928 (1970).

However, the evidence relevant to the fraud question is before us as Galey presented an offer of proof pursuant to I.R.C.P. 43(c). We must examine the record to determine if, as a matter of law, Galey can recover damages for the fraudulent representations. If Galey, as a matter of law, is not entitled to relief, the trial court's error in excluding parol evidence would be harmless as the error would not affect the substantial rights of the parties. See, *Rindlisbaker v. Wilson,* 95 Idaho 752, 519 P.2d 421 (1974).

Galey alleges that the units were misrepresented in several instances—that the machines were represented to be in operating condition, ready to be used on the job, whereas the machines needed considerable mechanical repairs before they were ready to be used; that the tires were represented to be in good condition whereas the tires were in poor condition; that the machines were represented to be 1965 models whereas they were 1963 models; and that the machines were represented to have 500 horsepower engines whereas they had 450 horsepower engines. Galey asserts that these representations were made in an advertising flyer mailed to Galey and in negotiations prior to the signing of the written lease agreement.

After reviewing the record, we find that Galey did not establish the materiality of Dickco's representations of the model year or the engine horsepower. Thus, Galey cannot recover damages flowing from these representations. *Fowler v. Uezzell,* 94 Idaho 951, 500 P.2d 852 (1972).

Regarding the representations as to the mechanical condition of the units and the condition of the tires, we must examine the modification of the agreement to determine whether Galey, by entering into this modification, waived its right to recover damages for the fraudulent representations. Only after Galey had inspected the units did the parties enter into the modification agreement. By this modification they agreed that Galey would repair the units, that Galey's costs of repair would be charged against the second monthly rental payment of $9,000, and that the rental period would begin when the machines reached the Baker jobsite rather than on July 1st.

The general rule is that

"[i]f one induced by misrepresentations or fraud * * * to enter into a contract for the * * * use of, property thereafter, with knowledge of the deception, receives from the party guilty of fraud some substantial concession or enters into a new contract in respect of the transaction, he thereby relinquishes all right to recover or recoup damages because of the misrepresentations." 37 Am.Jur.2d, Fraud and Deceit, § 397 p. 542 (1968).

Accord, *Chester v. McDaniel,* 264 Or. 303, 504 P.2d 726 (1972); *Conzelmann v. Northwest Poultry and Dairy Prod. Co.,* 190 Or. 332, 225 P.2d 757 (1950); *Dallas Farm Machinery Co. v. Minneapolis-Moline Co.,* 324 S.W.2d 578 (Tex.Civ.App., 1959); *Stevens v. Curtis,* 122 Cal.App.2d 30, 264 P.2d 606 (1953); 37 C.J.S. Fraud § 69 (1943). But cf., *Weitzman v. Bergstrom,* 75 Wash.2d 693, 453 P.2d 860 (1969). See, Restatement, Contracts § 89 (1932).

■ Testimony presented on behalf of Galey indicates that, at the time the lease agreement was modified, Galey was aware that unit # 8 had serious problems with the hydraulic system and the transmission, that units # 6 and 7 were not in operating condition and that there were problems with the tires. Discovery of these problems prompted Galey to enter into negotiations with Dickco to modify the lease agreement.

Knowledge of these problems placed or should have placed Galey on notice that the mechanical condition of the units and the condition of the tires were not as represented. See, *Housley v. Linnton Plywood Ass'n,* 210 Or. 520, 311 P.2d 432 (1957). Galey had knowledge of the facts regarding the representations as to the condition of the machine and the tires when it entered into a modified agreement; thus, by agreeing to modify substantially the written agreement, Galey waived its right to seek damages flowing from those representations.

Galey assigns as error the trial court's finding that a provision in the lease agreement was an effective disclaimer of any warranties and that there were no warranties, expressed or implied, created. This assignment of error requires consideration of two issues: whether any warranties were created, and, whether these warranties were effectively disclaimed.

Article 2 establishes three different warranties—express (I.C. § 28–2–313), implied warranty of merchantability (I.C. § 28–2–314), and implied warranty of fitness for a particular use (I.C. § 28–2–315). The implied warranties of merchantability and fitness for a particular purpose have been extended to lease transactions in the appropriate circumstances. *All-States Leasing Co. v. Bass, supra.* This court has not, on prior occasions, considered the question of whether express warranties (I.C. § 28–2–313) should be extended to lease transactions.

■ In this lease transaction, the same considerations which give rise to creation of implied warranties in a sales transaction are present. Dickco was a merchant specializing in the sale and leasing of heavy construction equipment and Galey argues that it relied on Dickco's expertise. Dickco placed the product into the stream of commerce and sought to reap economic benefits from the lease of the products. Finally, Dickco was in a better position to control the antecedent factors which affect the condition of the product. Note, "The Extension of Warranty Protection to Lease Transactions", 10 Boston College Ind. and Comm.L.R. 127 (1968). See, 48 A.L.R.3d Annot., "UCC Warranty Provisions—Bailments" p. 668 (1973); Farnsworth, "Implied Warranties of Quality in Non-Sales Cases", 57 Colum.L.R. 653 (1957). We find that I.C. § 28–2–314 (implied warranty of merchantability) and 315 (implied warranty of fitness for a particular purpose) should be extended to this transaction.[9]

Before examining the facts of this transaction to determine whether an implied warranty of merchantability or an implied warranty of fitness for a particular purpose was created, we will first consider the question of whether Dickco effectively disclaimed the implied warranties. If Dickco did effectively disclaim the implied warranties, then a consideration of the facts giving rise to the creation of the implied warranties would be superfluous.

■ Implied warranties of suitability arising in a bailment contract can be disclaimed. However, courts tend "to construe strictly language negativing the implication of such a warranty". 8 Am.Jur. 2d, Bailments § 147, p. 1042 (1963). See 68 A.L.R.2d Annot., Lease or Hire—Warranties § 7, p. 863 (1959). I.C. § 28–2–316(2), (3), allows the seller to disclaim implied warranties and provides a specific means for such a disclaimer.

Contrasting I.C. § 28–2–316 and the common law of bailments,[10] we can find no

---

9. For other cases holding implied warranties applicable, see notes 2, 3 and 4, supra.

10. The only substantial difference btween I.C. § 28–2–316 and the common law of bailments is that the Code provision places some limits on the application of the doctrine "caveat

emptor" in those cases where the buyer inspects the goods; implied warranties may be excluded or modified only in certain circumstances by the buyer's examination of the goods before entering into the contract. I.C. § 28–2–316(3)(b) and Comment 8. The rule as to bailments appears to be that "where

reason why I.C. § 28–2–316 should not be extended to this lease by analogy. Application of I.C. § 28–2–316 to a lease would allow the lessor to disclaim implied warranties and provides the specific means by which the lessor can effectively disclaim warranties at the time of the formation of the contract. Moreover, I.C. § 28–2–316 represents a statement by the legislature as to the public policy on disclaimers. *Baker v. City of Seattle,* 79 Wash.2d 198, 484 P. 2d 405 (1971). See, *All-States Leasing Co. v. Bass,* supra.

█ The written lease agreement at issue contains the following disclaimer:

> "NO WARRANTIES: Lessor makes no warranties either express or implied as to any matter whatsoever including, without limitation, condition of the equipment, its merchantability, or its fitness for any particular purpose."

The disclaimer was printed on the back side of the lease agreement in bold type of a larger size than the other type. To be effective, this disclaimer must be in accord with I.C. § 28–2–316(2):

> "Subject to subsection (3), to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous."

"Conspicuous" is defined in the Code [11]— "A term or clause is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it". I.C. § 28–1–201(10). Considering that the disclaimer was printed in bold type of a larger size on the back

of the lease and that the parties signed the lease only on the back side, we find that the notice of disclaimer was conspicuous. Thus, since the disclaimer was in writing, mentioned merchantability, was conspicuous, and was incorporated into the modified contract, we find that this disclaimer effectively disclaimed the implied warranties of merchantability and fitness for a particular purpose.

Galey also argues that express warranties were created and that Dickco breached these warranties and so is liable in damages. Galey submits that express warranties that the machines were in operating condition [12] and that the tires were in good condition were created. The trial court found in its conclusions of law that "there were no warranties, express or implied, attached to the lease".

Under Article 2, an express warranty may be created by an affirmation of a fact or promise:

> I.C. § 28–2–313. "Express warranties by affirmation, promise, description, sample. —(1) Express warranties by the seller are created as follows:
>
> (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
>
> (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description."

This section has been held to be applicable to a lease transaction. *KLPR TV, Inc. v. Visual Electronics Corp.,* 465 F.2d 1382 (8th Cir., 1972); *Owens v. Patent Scaffolding*

---

the lessee of a chattel inspects it before accepting it, there is no implied warranty of the chattel's suitability for the use he intends to make of it". 68 A.L.R.2d Annot. Lease or Hire—Warranties § 5, p. 859 (1959).

11. As the provision requiring a disclaimer to be conspicuous (I.C. § 28–2–316(2)) has been held to be applicable to this transaction, it

follows that the definition of conspicuous should also be applicable.

12. The record indicates that, according to the custom of the trade, a machine in operating condition was considered to be a machine in such mechanical condition that the machine could be operated on the job under working conditions without additional major repairs.

*Co.,* 77 Misc.2d 992, 354 N.Y.S.2d 778 (N.Y.Sup.Ct., 1974); *Hertz Commercial Leasing Corp. v. Transportation Credit Clearing House,* 59 Misc.2d 226, 298 N.Y.S.2d 392 (N.Y.Civ.Ct., 1969) rev'd on other grounds, 64 Misc.2d 910, 316 N.Y.S.2d 585; *Hawkins Constr. Co. v. Matthews Co., Inc.,* 190 Neb. 546, 209 N.W.2d 643 (1973). Contra, *Bona v. Graefe,* 264 Md. 69, 285 A.2d 607 (Md.Ct. of App., 1972)

 Express warranties can also be created by contract in a lease transaction. See, *Hatten Machinery Co. v. Bruch,* 59 Wash.2d 757, 370 P.2d 600 (1962); 68 A.L.R.2d Annot.: Lease or Hire—Warranties § 2, p. 858 (1959). Considering that an express warranty will generally only be created in a transaction where lessor's role is analogous to a seller rather than a financing agent, we find that I.C. § 28–2–313 should be applied to this transaction by analogy.

 The trial court's conclusion of law that there were no express warranties attached to the lease is supported by the record insofar as the written lease agreement is concerned; that is, no express warranties were created on the face of the lease. However, Galey argues that representations made by Dickco prior to the written agreement created express warranties as to the mechanical condition of the units and the condition of the tires. Assuming that such express warranties can be found in the negotiations leading to the execution of the lease agreement, and assuming further that evidence of the warranties was admissible, Galey waived any contractual rights arising from such express warranties upon entering into the modification of the lease agreement with knowledge of the mechanical and tire problems.[13] Galey was aware of the mechanical and tire problems when the lease modification was agreed to, yet Galey did not seek to incorporate any warranties into the modification; rather, Galey entered into an agreement which was, in effect, a "compromise" of the parties differing conceptions of their contractual rights and duties.

 Galey also assigns as error the trial court's finding that replacement tires placed upon the machines by Galey were replaced pursuant to the terms of the written lease and that the tires became the property of Dickco upon return of the machines by Galey.

> The written lease agreement provided, "Lessee—To be responsible for the replacement of all tires and components, except for natural wear, during the term of the lease."

This clause was not inconsistent with the modification of the contract; thus, this clause was incorporated into the contract as modified. The clause is susceptible of two distinct interpretations—(a) during the lease period, the lessee was obligated to replace all tires and components except that if the replacement was necessitated by natural wear, then the lessor was obligated to replace the tires and components; or (b) during the lease period, the lessee was obligated to replace all tires and components as necessary without regard to the event which necessitated replacement of tires and components but the lessor cannot seek replacement by the lessee if, at the expiration of the lease, the tires and components were in poor condition due to natural wear during the lease period. The trial court, applying the latter construction, found that Galey was obligated to replace the tires and that the tires became the property of Dickco upon the expiration of the lease period.

---

13. These representations, if made, may constitute express warranties. I.C. § 28–2–313. Moreover, the representations, if they were express warranties, may not have been effectively disclaimed by the disclaimer provision in the lease agreement. I.C. § 28–2–316(1). However, evidence of these representations may be barred from consideration by the trier of fact by the parol evidence rule. I.C. § 28–2–202, 316(1). Rather than consider these questions, we will assume that the representations constitute express warranties and were a part of the first agreement.

■ This clause is ambiguous, thus, the interpretation of this clause is a question of fact which was answered by the trial court in its role as a trier of fact. *Minidoka County v. Krieger*, 88 Idaho 395, 399 P.2d 962 (1965); *National Produce Distributors v. Miles & Meyer, Inc.*, 75 Idaho 460, 274 P.2d 831 (1954). See, 4 Williston, Contracts § 616 (3d ed. 1961); 3 Corbin, Contracts § 554 (1960). On appeal this court will review the trial court's ruling as a question of fact, not as a matter of law. The trial court's interpretation of this clause is supported by substantial although conflicting evidence and so will not be set aside on appeal as its finding is not clearly erroneous. *Hollandsworth v. Cottonwood Elevator Co.*, 95 Idaho 468, 511 P.2d 285 (1973).

We have reviewed Galey's other assignments of error. Certain of these assignments pertain to appropriate measure of damages if Dickco was in breach of the lease agreement; because we find Dickco not to be in breach of the lease agreement, we will not consider these. Galey's remaining assignments of error are without merit.

## ON CROSS APPEAL

On cross appeal, Dickco assigned as error the following finding of fact.

"At the time of the inspection of these machines by Galey at the yard of Dickco in late June of 1971, an oral agreement was entered into between Galey and Dickco to purchase one extra tire from Dickco for the sum of $1,750.00. This agreement, however, was later modified and the court finds that Dickco consented to the use of this tire upon the machines without charge to Galey."

14. Dickco, in its cross complaint, did not allege breach of the contract of sale for the tire. Galey does not assign this admission

Dickco argues that the parties entered into an oral agreement to purchase the tire, but that the parties did not agree to rescind the oral agreement. Dickco submits that this court should direct the trial court to enter judgment in favor of Dickco, in the additional amount of $1,750, plus costs and attorneys fees.[14]

This tire was brought by Galey from Reno when Galey transported units # 6 and 7 to Boise. During the meetings between Dickco and Galey to discuss the mechanical problems with units # 6, 7 and 8, the parties entered into an oral agreement for Dickco to sell and Galey to buy the tire for $1,750. The tire was then placed by Galey on one of the leased units. Dickco billed Galey for the tire on an invoice dated August 3, 1971.

■ Frank Galey testified that he thought it was understood between he and Dickco that Galey was not to pay the purchase price; rather, that the tire was to be used on the leased unit by Galey. Other than Frank Galey's testimony, the record is devoid of any testimony regarding the agreement to rescind the contract. On this issue, Dickco has the burden of showing error. *Close v. Rensink*, 95 Idaho 72, 501 P.2d 1383 (1972). Moreover, we must view the evidence in a light most favorable to Galey. *Fajen v. Powlus*, 96 Idaho 625, 533 P.2d 746 (1975). As there is no evidence to contradict Galey's testimony regarding the rescinding of the contract, we must affirm the trial court's finding of fact.

The judgment is affirmed. Each party will bear its own costs.

McQUADE, C. J., DONALDSON and SHEPARD, JJ., and SCOGGIN, District Judge (retired), concur.

as error; thus, we will assume that the pleadings have been amended to conform to the evidence. I.R.C.P. 15(b).