673 P.2d 392

**HILLSIDE SERVICE COMPANY, Plaintiff-Appellant,**

and

**Hayden Pines Water Company, Involuntary Plaintiff-Appellant,**

v.

**Robert ALCORN, Charles Baldwin, Gerald Burnham, James Emerson, William Griffith, Defendants-Respondents.**

No. 14481.

Supreme Court of Idaho.

Dec. 7, 1983.

Scott W. Reed, Coeur d'Alene, for appellants.

Samuel Eismann, Coeur d'Alene, for defendants-respondents.

SHEPARD, Justice.

This is an appeal from a declaratory judgment in favor of the defendants-respondents, in a class action involving the interpretation of restrictive covenants per-

taining to real property which plaintiffs had sold to defendants. We affirm.

Plaintiffs-appellants developed certain real property subdivisions in Kootenai County, Idaho.[1] In approximately 1974, plaintiffs developed the two real property subdivisions involved herein, *i.e.,* Hayden View Estates and Woodland Heights, both of which are on hills south of Hayden Lake, between Hayden Lake and Dalton Gardens, and which together constitute 88 individual parcels of land. At the outset, the developers determined that the area was not suitable for individual septic tanks for each lot and a community sewage treatment facility was designed, consisting of a basic drain field with sand filters. Since that system was self-operating, it involved no maintenance, and thus, after the installation, plaintiffs-appellants did not anticipate that there would be continuing costs for sewage treatment.

As adjacent subdivisions were constructed, health authorities determined it was necessary to upgrade the sewer system. In about 1977, at a cost of $150,000, plaintiffs installed a new and more sophisticated sewer system called a "rock upflow detoxification filter," which was capable of removing substantially all of the nitrates and nitrogen gas from the waste water of the subdivisions.

From the start, in selling lots, plaintiffs-developers had drafted documents entitled "Declaration of Restrictive Covenants," to which defendants-purchasers were required to agree. Those "covenants" included, at Covenant 11, the following provision:

"Hayden View Estates [Woodland Heights] shall *install, furnish and maintain* a sewage disposal system that will meet all requirements of and be approved by the Idaho Department of Health and Welfare. The sewage disposal system may be transferred by agreement and the obligations assumed by a sewer district to be formed to serve the area. Hayden View Estates [Woodland Heights] shall

remedy defects in the system and shall be responsible to individual lot owners and other affected persons for any failures in the system." (Emphasis supplied.)

As indicated by the language, the developers contemplated the formation of a sewer district to which they would turn over both the sewer system itself and their obligations respecting the sewer system. An attempt was made to organize such a sewer district in 1974–75, but the plan was abandoned when another sewer district preempted part of the area in late 1975. We are not asked to, nor do we, reach the question of such a proposed district's ability to charge the defendants here for the service of maintaining a sewer system.

In 1978, plaintiffs began sending bills of $11.84 per month to defendants, for costs of servicing the sewer system. The billed amount is not an issue on this appeal and not necessary to our decision. Approximately half of the property owners paid the billed amount, the rest refused to pay, and this action resulted.

In this appeal, we are presented only with interpretation of plaintiffs-developers' promise to "install, furnish and maintain a sewage disposal system." Defendants-homeowners argue that the term "maintain" is clear and unambiguous and, therefore, that the plaintiffs-developers are obliged to keep the sewer system operational and to bear the expenses thereof. On the other hand, plaintiffs-developers argue that the word "maintain" in the covenant does not include service charges, but rather in this context and under these facts means to uphold in a particular condition without allowing failure or decline.

The trial court, in finding for defendants, stated:

"Considering that a water and sewer district is permitted by law to charge maintenance and operation costs; that the covenant itself anticipates a transfer of the sewage disposal system to a sewer

---

**1.** After the filing of this action, the developers sold their stock ownership in the plaintiff corporation to Hayden Pines Water Company, and thereafter Hayden Pines was brought into this action as an involuntary plaintiff.

district; and that the covenant itself provides that prior to such a transfer that the developers 'shall install, furnish and maintain a sewage disposal system'; and that at the very least, it was represented to the purchasers that until such transfer to a sewer district, there would be no charges for sewer service, it would appear that there was a meeting of the minds between the parties that no such charges would be levied until a sewer district took over the system.

"The language of Covenant 11 is not ambiguous or uncertain. The words 'install, furnish and maintain' are words of common meaning and understanding, and the definitions provided by <u>Words and Phrases</u>, Permanent Edition, define the word 'install' as, to set in place. The word 'furnish' means to provide what is necessary for or to supply, and the word 'maintain' means to keep up and preserve as a continuing obligation.

"The evidence further showed, by Defendants' Exhibit A, that in subdivisions sold after the two here concerned by these same developers that the Restrictive Covenant, referring to sewer service, specifically provided for usage charges.

"Under these circumstances, the Court can only conclude that the developers are obligated to furnish sewer service to the lot owners of Woodland Heights and Hayden View Estates without cost until such time as a sewer district would assume the obligation to maintain the system and which by law would have the power to charge reasonable service charges."

▉▉▉ That interpretation of plaintiffs-developers' promise to "maintain" the sewer system is supported by substantial evidence and will not be disturbed on appeal. It is within the province of the trial judge to decide the meaning of the contractual term, according to his view of the circumstances surrounding the formation of the contract and his determination of the intent of the parties. *Clark v. St. Paul Property and Liab. Ins. Cos.* 102 Idaho 756, 639 P.2d

454 (1981); *Glenn Dick Equipment Co. v. Galey Const., Inc.,* 97 Idaho 216, 541 P.2d 1184 (1975).

Here, the testimony at trial indicated that the parties' agreement, as reflected in their oral and written promises, was for plaintiffs to provide sewer services without charge, unless and until a sewer district was formed which would assume those obligations. There was adequate testimony from the defendant property owners to that effect and, while that testimony might appear somewhat self-serving, it is clearly supported by testimony from plaintiffs-developers.

George Anderl, one of the primary developers of the two subdivisions here involved, testified:

"Q ... [Y]ou are quite sure there were no hookup fees for sewer?

"A Absolutely.

"Q Did you ever represent to anyone that there would be no service charges for the sewer service for any purchaser of Hayden View or Woodland Heights First Addition?

"A If they would have asked me what the charges are for utilities, *I would have told them* it was a $6 charge for water from Honeysuckle Hills, and *there was no sewer charge.*

"Q At that time?

"A That's correct.

"Q Did you ever make any representations that there would never be any?

"A Not ever, because no such thing as never to be a charge.

"Q Do you recall the subject of service charge for sewers coming up?

"A I don't think it was discussed. We had not contemplated a service charge at that time because of the limited expense with just lagoons for the first three or four years." (Emphasis added.)

Tom Kosewic, a building contractor who was a real estate agent at the time these parcels were sold and who handled the sales of some property within Woodland Heights and Hayden View Estates, was questioned as follows:

"Q Were you given instructions by Mr. Turnipseed [one of the developers] relating to those sales and relating to sewer system service in that area?

"A Yes.

"Q When would you have been given those instructions?

"A When the original covenants were drafted. I recall we had a meeting, and everybody looked at the covenants, more or less picked them apart. And a question did come up that—what about the sewer. And at that time we were told that the people would pay 500 water hookup, which was stated I believe in that item about—10 about the water, there would be a charge. But as far as the sewer went, that you pay for your septic tank, and you pay for your pump, tank on your property. Then there would be no charge after that unless the major district got formed down below. As I said, they had to look into it. Then it was out of their hands.

"Q Were you instructed to tell prospective purchasers that—

"A Yes.

"Q —when that came up?

Did you do so?

"A Yes."

Robert Turnipseed, one of two partners in the Hayden View Estates operation and a major stockholder in Woodland Heights, Inc., testified as follows:

"Q Apparently you contemplated there would be no charges until a sewer district took over. Is that pretty much it?

"A Well, at that time with the lagoon, we didn't contemplate any, no.

"Q The lagoon was taking care of those original homes up there, wasn't it, Bob?

"A Yes, uh-huh.

"Q And then when these other homes were added and other additions, that is when the thing started—obviously changes had to be made?

"A Between the addition of the land—lots that developed and the changes in regulations through the De-partment of Environment and the Panhandle Health District, those stages in 1974, '75, we had no clear guidelines from any governmental agency other than, do it on your own, and then we'll approve it after it's been proven.

"Q Did you as the developer obtain any figures from LePard and Frame concerning the utility costs of operating and maintaining the system, projected costs?

"A I can't recall any in the early stages.

"Q Would that be because you didn't really anticipate any because of the lagoon?

"A I felt probably that we didn't anticipate that many that we could front load the subdivision. In other words, we had so much of the main lines to put in to take care of 400 lots. And we felt that before we got too deep into the subdivision, the Lake Sewer and Water District would be an actuality.

"Q Hillside Service, sewer division, is what you and George formed for taking over this sewer situation; is that it?

"A Yes, because we were informed at the time that we couldn't turn it over to the homeowners association. And someone had to maintain it until the sewer district came into being."

■ We further note that, in the "Declaration of Restrictive Covenants" in the section involving the developers' obligation to provide an adequate water supply, there is stated, "Each lot owner agrees to pay the tap-on fee and usage charges as required for the maintenance and operation of the system . . . and usage charges on a monthly basis." Clearly, plaintiffs-developers could have made clear an intent to charge a service fee for sewage services, just as they did in the provision relating to water services. The documents in question here are viewed as being drafted by plaintiffs-developers, and hence the basic tenets of contract law require that the provisions of the contract be construed in favor of the non-drafting party. *Chapman v. Haney Seed Co., Inc.,* 102 Idaho 26, 624 P.2d 408 (1981);

*Werry v. Phillips Petroleum Company,* 97 Idaho 130, 540 P.2d 792 (1975); *Ries v. Pacific Fruit & Produce Co.,* 50 Idaho 140, 294 P. 336 (1930).

On the basis of the narrow question presented on appeal, we affirm the decision of the district court. Costs to defendants-respondents. No attorneys' fees allowed.

DONALDSON, C.J., and BAKES, BISTLINE and HUNTLEY, JJ., concur.