656 P.2d 1359

LOOMIS, INC., Plaintiff,

v.

Audrie B. CUDAHY, Defendant,
Counter-Claimant, Third Party
Plaintiff-Appellant,

v.

John R. SMITH, Third Party
Defendant-Respondent,

and

Ronald W. Liese; Liese & Associates Insurance, Inc., an Idaho Corporation; and United Pacific Insurance Co., a Washington Corporation, Third Party Defendants.

Ronald W. LIESE and Liese & Associates
Insurance, Inc., an Idaho Corporation,
Cross-Claimants,

v.

John R. SMITH and United Pacific Insurance Co., a Washington Corporation, Cross-Defendants.

No. 13291.

Supreme Court of Idaho.

Oct. 1, 1982.

Rehearing Denied Feb. 3, 1983.

Edward A. Lawson, Ketchum, and Robert Nord, Chicago, Ill., for defendant, counter claimant, third party plaintiff-appellant.

Terry G. Hogue, Ketchum, for third party defendant-respondent.

DONALDSON, Justice.

A contract was entered into between the appellant-third party plaintiff Audrie B. Cudahy and the respondent-third party defendant John R. Smith on February 2, 1976. Smith was to perform for compensation by Cudahy services as an architect in the construction of a single-family dwelling. The contract contained an arbitration clause.[1] It also recited that the house would be built on a particular lot, but in fact the house was built on a different lot. Upon Smith's recommendation, Cudahy entered into a construction contract with a contractor. A performance bond was issued by Ronald W. Liese and Liese & Associates Insurance, Inc. purportedly as agents for United Pacific Insurance Company. The contractor defaulted and another contractor Loomis came in and contracted with Liese to complete the house on a time and materials basis. When his final bill of approximately $14,000.00 was not paid, Loomis filed a mechanic's lien against the property and later filed an action to foreclose on the claim of lien against Cudahy. In turn, Cudahy filed a third-party complaint against Smith and others. A default judgment was entered against Smith which later was set aside.

Pursuant to the provisions of I.C. § 7–902(a) an evidentiary hearing was held on December 2, 1977, before the district court to determine whether a valid agreement to arbitrate existed between the parties. After reviewing briefs and considering the oral testimony presented by Cudahy, the district court ordered the parties to proceed to arbitration. Cudahy sought certified interlocutory review of this order which was denied by this Court on February 3, 1978.

Pursuant to a district court order, the American Arbitration Association (AAA) was appointed to arbitrate the dispute. In August 1978, Cudahy filed a motion to dismiss arbitration with the AAA which was forwarded to the arbitrator. The AAA gave notice dated October 10, 1978, that the arbitration hearing would be held on December 4, 1978. The arbitrator by letter dated November 14, 1978, informed the AAA that the parties had agreed to reschedule the hearing to December 5, 1978. The AAA gave notice dated November 17, 1978, of the new hearing date. Cudahy's counsel sought by letter dated November 16, 1978, a continuance until February 1979 due to alleged personal problems which made Cudahy unavailable for the scheduled

1. The arbitration clause read as follows:

"ARTICLE 8"
ARBITRATION

All claims, disputes and other matters in question between the parties to this Agreement, arising out of, or relating to this Agreement or the breach thereof, shall be decided by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association then obtaining unless the parties mutually agree otherwise. No arbitration, arising out of, or relating to this Agreement shall include, by consolidation, joinder or in any other manner, any additional party not a party to this Agreement except by written consent containing a specific reference to this Agreement and signed by all the parties hereto. Any consent to arbitration involving an additional party or parties shall not constitute consent to arbitration of any dispute not described therein or with any party not named or described therein. This Agreement to arbitrate and any agreement to arbitrate with an additional party or parties duly consented to by the parties hereto shall be specifically enforceable under the prevailing arbitration law. In no event shall the demand for arbitration be made after the date when such dispute would be barred by the applicable statute of limitations. The award rendered by the arbitrators shall be final."

hearing. Later, Cudahy's counsel made a formal request for postponement dated December 4, 1978, which was mailed and also hand delivered to the arbitrator and Smith's counsel. On December 5, 1978, after reviewing the request, the arbitrator denied it and proceeded with the hearing. After the denial, Cudahy's counsel left the hearing without presenting any evidence. The arbitrator rendered an award on December 20, 1978, which denied the claims of both parties.[2]

After receiving cross-motions to confirm or vacate, the district court confirmed the arbitration award and later denied Cudahy's motion for reconsideration of the confirming order. Cudahy appeals. We affirm.

Appellant Cudahy first contends that no ruling was ever made on the question of whether or not the agreement to arbitrate was valid and enforceable. This contention is without merit as the record clearly reveals that after a hearing was conducted pursuant to I.C. § 7–902(a), the district court found a valid and enforceable agreement to arbitrate.

■ Under I.C. § 7–901 "a provision in a written contract to submit to arbitration any controversy thereafter arising between the parties is valid, enforceable and irrevocable, save upon such grounds as exist at law or in equity for the revocation of any contract." This provision together with the following sections comprises the Idaho Uniform Arbitration Act as enacted by our legislature in 1975. By passage of the act, our legislature has aligned Idaho with the majority of jurisdictions which have adopted the Uniform Arbitration Act. Under the act arbitration and agreements to arbitrate are encouraged and given explicit recognition as effective means to resolve disputed issues.[3] Arbitration generally offers an inexpensive and rapid alternative to prolonged litigation.[4] It also serves to alleviate crowded court dockets. Since our own sparse array of arbitration caselaw evolved before our legislature enacted the Uniform Arbitration Act as promulgated by the National Conference of Commissioners on Uniform State Laws, it is necessary for us to look for possible edification and guidance among the courts of our sister states and the federal system.

I.C. § 7–901 and Section 1 of the Uniform Arbitration Act closely parallel Section 2 of the Federal Arbitration Act.[5] In *County of Middlesex v. Gevyn Construction Corp.,* 450 F.2d 53, 56 (1st Cir.1971), *cert. denied,* 405 U.S. 955, 92 S.Ct. 1176, 31 L.Ed.2d 232 (1972), the court held "that the only grounds for revocation which meet the requirement of 9 U.S.C. § 2 are mutual agreement or a condition which vitiates

---

2. The arbitrator's award recited that: "This award is in full settlement of all claims submitted to this Arbitration."

3. "The whole purpose of arbitration is to substitute a less expensive and less formal method of settling differences between parties for normal court litigation. In arbitration greater use may be made of persons who have a particular expertise that may permit them to adjudicate and settle differences that may exist on highly technical matters." *City of Madison v. Frank Lloyd Wright Foundation,* [20 Wis.2d 361], 122 N.W.2d 409, 421 (Wis.1963). *See also Pettinaro Constr. Co., Inc. v. Harry C. Partridge, Jr. & Sons, Inc.,* 408 A.2d 957 (Del.Ch.1979); *Bel Pre Medical Center, Inc. v. Frederick Contractors, Inc.,* [21 Md.App. 307], 320 A.2d 558 (Md.Ct.Spec. App.1974), *aff'd on other grounds,* [274 Md. 307], 334 A.2d 526 (Md.1975); *Layne-Minnesota Co. v. Regents of Univ. of Minnesota,*

[266 Minn. 284], 123 N.W.2d 371 (Minn. 1963).

4. "Every lawyer understands perfectly that a law suit is a very poor way to resolve conflicts. Regardless of who emerges victorious from the courtroom, everyone loses. The time, effort, and expense of a law suit drains both parties. The trauma can be lessened considerably, however, if arbitration is used to settle the same dispute." *Board of Education of County of Berkeley v. W. Harley Miller, Inc.,* 221 S.E.2d 882, 888 (W.Va.1975) (Neely, J., concurring).

5. "A written provision in ... a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.

agreement *ab initio,* i.e., fraud, mistake, or duress." *In Halcon International, Inc. v. Monsanto Australia Limited,* 446 F.2d 156 (7th Cir.), *cert. denied,* 404 U.S. 949, 92 S.Ct. 286, 30 L.Ed.2d 266 (1971), *reh'g denied,* 404 U.S. 1026, 92 S.Ct. 672, 30 L.Ed.2d 677 (1972), the court stated with regard to revocation under § 2 that

> "[t]he word 'revocation,' when used in a contractual context, ordinarily refers to revocation of an offer or an option; but it is used in Section 2 of the Arbitration Act to apply to a contract and in that connotation obviously is intended to be synonymous with 'rescission.' Rescission is an appropriate remedy when, for example, a contract is induced by fraud, mistake or duress, and is 'used chiefly where the termination of the contractual relation is by mutual consent.' 5 Williston, Contracts § 1454A, page 4063 (Rev.Ed., 1937). 'Revocation' and 'cancellation' are closely synonymous; to revoke means 'to annul, repeal, rescind, cancel.' *Glenram Wine & Liquor Corp. v. O'Connell,* 295 N.Y. 336, 67 N.E.2d 570 (1946).

> "Since the savings clause of Section 2 is limited to 'revocation,' this is clearly the only type of 'unmaking' contemplated by the act—that is, an unmaking resulting from the mutual cancellation of the contract by the parties or the voiding of the transaction due to fraud, mistake or duress." *Id.* at 159.

In *World Brilliance Corp. v. Bethlehem Steel Co.,* 342 F.2d 362, 364 (2d Cir.1965), the court held that " '[r]evocation' ... [under § 2 of the act] applies only to cases in which the courts will step in and rescind the agreement, for reasons such as fraud, duress, or undue influence."

In *Bernalillo County Medical Center Employees' Association Local Union No. 2370 of Southwestern Council of Industrial Workers, United Brotherhood of Carpenters, AFL–CIO v. Cancelosi,* 92 N.M. 307, 587 P.2d 960 (1978), the court examined their statute which parallels our Section 7–902(a) and stated:

> "Under this Act it is the court's duty to order arbitration where provision for it is clear. Where provision for arbitration is disputed, the court's function is to determine whether there is an agreement to arbitrate and to order arbitration where an agreement to arbitrate is found." *Id.* at 961; *see also School District No. 46, Kane, Cook, and DuPage Counties v. Del Bianco,* [68 Ill.App.2d 145], 215 N.E.2d 25, 31 (Ill.App.1966); *Bel Pre Medical Center, Inc. v. Frederick Contractors, Inc.,* [21 Md.App. 307], 320 A.2d 558 (Md.Ct.Spec. App.1974), *aff'd on other grounds,* [274 Md. 307], 334 A.2d 526 (Md.1975).

█ This is our first opportunity under the Idaho Uniform Arbitration Act to consider the task confronting a district court judge when entertaining cross-motions to compel or stay arbitration under I.C. § 7–902. By the language of I.C. § 7–902(a) when

> "[o]n application of a party showing an [arbitration] agreement ... and the opposing party's refusal to arbitrate, the court shall order the parties to proceed with arbitration, but if the opposing party denies the existence of the agreement to arbitrate, the court shall proceed summarily to the determination of the issue so raised and shall order arbitration if found for the moving party, otherwise, the application shall be denied."

Faced with the issue of determining the proper scope of inquiry required under I.C. § 7–902 and being mindful of the objectives of the arbitration mechanism, we hold that the inquiry must be limited in scope—is there an agreement to arbitrate or is there not. It would be inappropriate to review the merits of the dispute as such would in many instances emasculate the benefits of arbitration.

█ Appellant contends that the district court's finding in his order on arbitration that a valid agreement was in existence was based upon a severely restricted hearing. In appellant's brief, it is alleged that the appellant was not permitted to introduce proof on issues such as rescission, fraud in the inducement, adhesion contract, vagueness, mutual revocation, waiver, estoppel, fraud or misrepresentation, and

want of consideration. Appellant argues that this constituted error and should necessitate a reversal and remand for a new evidentiary hearing. However, appellant has failed to demonstrate that at the first evidentiary hearing such restriction occurred; Cudahy's counsel made insufficient offers of proof when objections were sustained as to his lines of questioning at the hearing. As we expressed in *Rutter v. McLaughlin*, 101 Idaho 292, 293, 612 P.2d 135, 136 (1980):

> "On appeal the appellant must carry the burden of showing that the district court committed error. Error will not be presumed on appeal but must be affirmatively shown on the record by the appellant. *Dawson v. Mead*, 98 Idaho 1, 557 P.2d 595 (1976); *Glenn Dick Equip. Co. v. Galey Construction, Inc.*, 97 Idaho 216, 541 P.2d 1184 (1975)."

Our rule has been that on appeal district court findings of fact will not be overturned unless clearly erroneous. I.R.C.P. 52(a).

▬ At the evidentiary hearing, Cudahy admitted signing the February 2, 1976, contract and stipulated to its execution and it was admitted as an exhibit. Cudahy's counsel argued that this contract could be amended only in writing and this was not done, that the contract recited that the house would be built on a particular lot and in fact it was built on a different lot, that the written contract was therefore no longer valid, and that the written agreement between the architect and owner was replaced with an oral agreement. On cross-examination, Cudahy admitted that she entered into no written agreement to terminate the contract. Implicit in the ruling of the district court compelling arbitration must be that the February 2, 1976, contract was either amended in fact as to the term describing the lot or that Cudahy was es-

topped to deny such an amendment.[6] The district court stated that "It seems to me that the matters to which she [Cudahy] testified are matters of whether or not the contract was performed and have nothing basically to do at this point with whether or not the agreement is void." It seems beyond cavil that evidence of a breach of a contract does not invalidate a contract. Our review of the hearing transcript does not reveal that the district court's statement was in error. Our examination of the record does not disclose that the district court's finding of a valid agreement to arbitrate was clearly erroneous; therefore, we will not disturb this finding.

▬ The next issue concerns whether the district court erred in refusing to vacate the arbitrator's award when faced with a motion to vacate upon the grounds "that the Arbitrator refused to postpone the hearing upon sufficient cause being shown therefor . . . ." It is necessary for decision to review the statutory grounds for vacating an award as established by I.C. § 7–912(a):

> "(a) Upon application of a party, the court shall vacate an award where:
>
> (1) The award was procured by corruption, fraud or other undue means;
>
> (2) There was evident partiality by an arbitrator appointed as a neutral, or corruption in any of the arbitrators, or misconduct prejudicing the rights of any party;
>
> (3) The arbitrators exceeded their powers;
>
> (4) The arbitrators refused to postpone the hearing upon sufficient cause being shown therefor or refused to hear evidence material to the controversy or otherwise so conducted the hearing, contrary to the provisions of section 7–915, Idaho

---

**6.** We have held that

> "one party to a contract cannot alter its terms without the assent of the other and that the minds of the parties must meet as to any proposed modification. The fact of agreement may be implied from a course of conduct in accordance with its existence and

assent may be implied from the acts of one party in accordance with the terms of a change proposed by the other." *Ore-Ida Potato Products, Inc. v. Larsen*, 83 Idaho 290, 296, 362 P.2d 384, 387 (1961); *Smith v. Washburn-Wilson Seed Co.*, 54 Idaho 659, 663, 34 P.2d 969, 970 (1934).

Code,[7] as to prejudice substantially the rights of a party; or

(5) There was no arbitration agreement and the issue was not adversely determined in proceedings under section 7–902, Idaho Code, and the party did not participate in the arbitration hearing without raising the objection.

The fact that the relief was such that it could not or would not be granted by a court of law or equity is not ground for vacating or refusing to confirm the award."

Cudahy by motion to vacate alleged the statutory grounds that the arbitrator refused to postpone the hearing upon sufficient cause being shown. I.C. § 7–912(a)(4). One of the principal attributes of the arbitration process is that it promotes a speedy resolution of controversies. To vacate an award under I.C. § 7–912(a)(4), a party must demonstrate that the arbitrator was shown "sufficient cause" for postponement. In the appellant's brief was a further allegation of evident partiality which under § 7–912(a)(2) would be additional grounds for vacating the award. From our review, we find no error in the district court's determination. It is not "sufficient cause" to merely be unable to attend a hearing when given adequate notice. I.C. § 7–905(a) provides that "[t]he arbitrators may hear and determine the controversy upon the evidence produced notwithstanding the failure of a party duly notified to appear." I.C. § 7–907(b) provides a method by which Cudahy could have presented her side to the arbitrator by deposition despite her professed inability to attend. We do not suggest that no set of circumstances could exist which would establish "sufficient cause." We only conclude that this appellant has failed to establish "sufficient cause." The hearing was scheduled for December 5, 1978, and Cudahy through counsel made formal request for postponement no earlier than December 4, 1978, by mail and on December 5, 1978, by hand delivery to the arbitrator just prior to the hearing. The circumstances recited as precipitating the

request do not lead us to second guess the district court or arbitrator. Arbitration is not to be avoided by dilatory tactics.

 Appeal is also founded upon the district court's denial of appellant's motion for reconsideration of the order confirming the award. This motion is treated as a motion under I.R.C.P. 59(e). *Obray v. Mitchell,* 98 Idaho 533, 567 P.2d 1284 (1977). The motion does not advance any new grounds for vacating the arbitration award. Because we hold that the district court's power to vacate an arbitration award is confined to the statutory grounds set forth in I.C. § 7–912(a), we affirm the denial. See *Pawlicki v. Farmers Insurance Co.,* 127 Ariz. 170, 618 P.2d 1096 (Ariz.Ct.App.1980).

 Appellant argues that an additional policy issue is present which should deny enforcement of the arbitration agreement. Appellant phrases this issue as "where the issues between two parties to a complex, multi-party action are subject to an agreement to arbitrate, and the remaining parties and related controversies are not, does the policy of complete and consistent adjudication contained in the Idaho Rules of Civil Procedure require that arbitration be denied?" This issue first appears in the record in Cudahy's motion for reconsideration of the order confirming the arbitration award. Since we do not consider this issue to have been timely raised, we do not pass judgment upon its merits. *E.g., State ex rel. Evans v. Click,* 102 Idaho 443, 449, 631 P.2d 614, 620 (1981), mem., 455 U.S. 987, 102 S.Ct. 1608, 71 L.Ed.2d 846 (1982); *McNeil v. Gisler,* 100 Idaho 693, 696, 604 P.2d 707, 710 (1979); see also *Hall v. Boise Payette Lumber Co.,* 63 Idaho 686, 693, 125 P.2d 311, 314 (1942).

Attorney fees on appeal are denied both parties.

The district court orders are affirmed.

BAKES, C.J., and McFADDEN and SHEPARD, JJ., concur.

(McFADDEN, J., registered his vote prior to his retirement on August 31, 1982.)

7. The reference to § 7–915 is confusing and may be in error.

BISTLINE, Justice, dissenting.

Mr. Nord, who appeared with Mr. Lawson and argued on behalf of Mrs. Cudahy on appeal, grouped his argument into three parts. First, he argued that Mrs. Cudahy should not have been forced into arbitration on the basis of the form agreement which Smith produced and she obligingly signed. Second, he argued that the arbitration hearing officer and the tribunal which appointed him were not justified in proceeding in the face of a motion for postponement—hence the district court erred in not vacating the award and allowing her a day in court. Third, he argued that because of the myriad of issues and parties involved in the controversy the district court should not have directed arbitration.

The Court's opinion holds, as did the district court, that Mrs. Cudahy was not entitled to a postponement. It discloses little of her grounds for requesting a postponement and takes the liberty of giving no effect to her first request for a postponement, which apparently is thought to have been "informal."[1] The Court declines to address the third issue—complexity severe enough to render this entire controversy unarbitrable—on the basis that it was not timely raised. The Court ordinarily reserves that rationale for use where an issue is raised on appeal for the first time—not so with this case. With ease the Court finds little merit in Mrs. Cudahy's contention that she should not have been obliged to arbitrate on the basis of her signature on the contract with Smith. The Court's opinion correctly observes that this is a case without prior Idaho precedent, but fails to perceive that such is all the more reason for closer scrutiny of the claimed error. The Court has ducked a very important and difficult issue in not addressing complexity—which is an even more troublesome aspect when it is so apparent that this entire case with its numerous issues and parties should not be subject to piecemeal resolution. Under these circumstances, the denial of the request for postponement may be seen as simply gross.

## I. *A General Overview*

John R. Smith should look favorably upon what may have been his only encounter with the Idaho court system and its rules of procedure which are supposedly guided by the principle requiring a liberal construction so as "to secure the just, speedy and inexpensive determination of every action and proceeding." I.R.C.P. 1(a). Rule 1 is "a constant reminder that the rules are to be liberally construed, and a just result is always the ultimate goal to be accomplished." *Sines v. Blaser,* 98 Idaho 435, 439, 566 P.2d 758, 762 (1977). "It has long been judicial policy in Idaho that controversies be determined and disposed of each on its own particular facts and as substantial justice may require. The exercise of judicial discretion should tend to bring about a judgment on the merits." *Bunn v. Bunn,* 99 Idaho 710, 711, 587 P.2d 1245, 1246 (1978).

This policy is frequently applied when the Idaho courts are asked to set aside a judgment which has been taken against a defendant by default. Such happened to John R. Smith when in this action on September 16, 1977, judgment was entered against him for approximately $160,000 for proven damages chargeable to him arising out of his contract with Audrie Cudahy to supervise the construction of a residence dwelling. Later by order of the trial court the default and default judgment were set aside. Although the record before us does not contain any documentation showing the basis upon which this was accomplished, and it is not of issue on appeal, one may be certain that the long established judicial policy mentioned above played a prominent part in the judge's determination to set aside the judgment and give John Smith his "day in court." But, on the other hand—

In the annals of Idaho litigation Audrie B. Cudahy will surely be entitled to some reknown as one of the few unfortunate individuals who would see little of Idaho's judicial policy of liberality. All she wanted

1. Cudahy's counsel initially sought a continuance by a letter dated November 16, 1978, and a "formal" request for postponement was dated December 4, 1978. *See* part III, *infra.*

to do was build her own house. Unlike most who venture into that area, she did everything right—hired an architect, obtained a written contract with her builder, and required a performance bond—and she was surely entitled to look forward to that happy day when the house would be completed. How it was all to turn out, however, was first signalled in *Loomis, Inc. v. Cudahy v. Smith,* 101 Idaho 459, 615 P.2d 128 (1980), wherein are found the beginnings of Audrie Cudahy's tale of woe and frustration in this Court's statement of the factual background:

> "Cudahy hired Smith, an architect, to design and supervise the construction of a house. Upon the recommendation of Smith, a contract was entered into with one Griffin for the construction of the house. Griffin was required to furnish a performance bond in connection with his contract to construct the house and that performance bond was issued by Ronald W. Liese and Liese & Associates Insurance, Inc. purportedly as agents for United Pacific Insurance Company. Griffin defaulted on his construction contract and failed to complete the building. Loomis, Inc. contracted to complete materials basis, and did so complete the structure according to the specifications, except for certain portions which were allegedly not completed because of weather. Griffin's original contract price for the construction of the house was $45,015.22. The asserted cost of the structure, as partially built by Griffin and completed by Loomis, was $71,610.02.

> "When Loomis was not paid the amount of approximately $14,000.00 as his final bill for the completion of the structure, he filed the instant action seeking to foreclose a mechanic's lien against the Cudahy property. Cudahy filed a counterclaim against Loomis for the completion of the structure and also alleged Loomis used poor workmanship. Cudahy also filed a third party complaint against the architect Smith alleging malpractice

and breach of contract, and against Liese, Liese Associates Insurance Company, and United Pacific Insurance Company, asserting liability under the performance bond obligation issued in connection with the Griffin contract. Upon motion therefor, Loomis, Inc. was granted summary judgment foreclosing the mechanic's lien on the Cudahy residence." 101 Idaho at 460, 615 P.2d at 129.

The trial court's foreclosure of the mechanic's lien was reversed in that earlier case, a result I certainly was in favor of, although for procedural technicality I felt compelled to vote with Justice Bakes, who believed the appeal was premature.

In *Loomis,* as I remember it, there was no suggestion that the many-pronged controversy involving the various parties might be split and some of it taken out of the court system. The unanticipated, however, was to occur, making it later appear that Audrie Cudahy, who though she had done everything right, had not done so in failing to retain an attorney to examine the form contract which Smith provided. In all probability, however, she never expected any controversy with Smith, who was her friend, and who agreed on her behalf to supervise construction of her house. But even had she covered that base too, it is not likely that she would have comprehended that one simple little phrase in her contract with Smith mentioning arbitration would, in the event a dispute did arise, take her out of the Idaho courts and before some nonjudicial private enterprise "tribunal" operating out of Seattle, Washington offices. I doubt that either party knew much, if anything, about arbitration procedures, and doubt further that they discussed the arbitration provisions. It is extremely unlikely that either party had ever seen the Construction Industry Arbitration Rules of the Arbitration Association of America, which would be the tribunal of arbitration.[2]

"Confusion" is the best description of the events which have transpired since the orig-

---

**2.** The first filing of these rules in the Idaho State Law Library appears not to have been made until after the commencement of litigation when Cudahy's attorney inquired at the library in a search for the Rules and Regulations.

inal complaint was filed by Loomis, Inc. more than five years ago. At the outset, respondent Smith's failure to answer the third-party claim which subsequently resulted in a default judgment being entered against him was ostensibly in belief that arbitration was the exclusive remedy for resolution of disputes arising between himself and appellant Cudahy, as is evidenced by the motion to dismiss for lack of jurisdiction filed when Smith had suffered the default judgment—the court deciding it would treat the motion to dismiss as a motion to compel arbitration. Smith's counsel urged upon the court that issues addressed to the arbitrability of the dispute were to be settled by the arbitrator at the arbitration hearing itself. I.C. § 7–901, however, determines the validity of arbitration agreements and supports a different conclusion.

"Validity of arbitration agreement.—A written agreement to submit any existing controversy to arbitration or a provision in a written contract to submit to arbitration any controversy thereafter arising between the parties is valid, enforceable and irrevocable, *save upon such grounds as exist at law or in equity for the revocation of any contract . . . ."* I.C. § 7–901 (1979) (emphasis added).

I.C. § 7–901 is structured as a guideline for determination of the existence of a *valid* arbitration agreement as required by § 7–902(a).[3] It is not provided for arbitrators but rather for trial judges faced with motions to compel arbitration. As noted in *Berkovitz v. Arbib & Houlberg, Inc.,* 230 N.Y. 261, 130 N.E. 288, 291 (1921), by Judge Cardozo, then of the Court of Appeals of New York, "[w]hether [the parties] have so contracted [for arbitration] is a question which the court must still determine for itself." *See Application of Spectrum Fabrics Corp.,* 285 App.Div. 710, 139 N.Y.S.2d

612 (1955), *affirmed* 309 N.Y. 709, 128 N.E.2d 416 (1955); 5 Am.Jur.2d, Arbitration and Awards § 15 (1962). It was error for the court to avoid this determination at the hearing on the motion to compel arbitration when I.C. § 7–901 specifically contemplates allowing introduction of "such grounds as exist at law or in equity for the revocation of any contract" as a defense to a "valid, enforceable and irrevocable" arbitration agreement. The judge's error in this regard substantially prejudiced Cudahy's interest since no subsequent opportunity was provided for her to present these fundamental issues. The judge, however, cannot be faulted for the end product of the confusion. Notwithstanding his certification of the issue to this Court pursuant to I.A.R. 12, this Court denied appellant Cudahy's interlocutory appeal.

Similarly, the arbitrator's failure to rule on the arbitrability issue, although the American Arbitration Association (AAA) tribunal specifically acknowledged it, was a further inroad on Cudahy's rights—all in my opinion growing out of confusion born of the lack of precedential guidelines. One of the most disturbing aspects of this case, however, is the apparent failure of the AAA to comply with the Construction Industry Arbitration Rules (hereinafter Rules) promulgated by the AAA. Sections 13, 14 and 15 of the Rules outline the procedure for appointment of arbitrator(s). Each section initially contemplates input from the parties involved in the dispute regarding the individual(s) to be appointed for the hearing. It does not appear from the record that Cudahy was provided with any opportunity to determine who was to decide her fate. Smith originally had moved the district court to appoint the AAA to act as arbitrator and it was so ordered. Cudahy's counsel did not object to the AAA's appointment at that time. It

---

**3.** I.C. § 7–902(a) reads as follows:

"Proceedings to compel or stay arbitration.—(a) On application of a party showing an agreement described in section 7–901, Idaho Code, and the opposing party's refusal to arbitrate, the court shall order the parties to proceed with arbitration, but if the opposing party denies the existence of the agreement to arbitrate, the court shall proceed summarily to the determination of the issue so raised and shall order arbitration if found for the moving party, otherwise, the application shall be denied."

was apparent that neither Smith nor Cudahy knew that the AAA did not act as an arbitrator and was merely a private enterprise court of sorts which would supervise the arbitration procedure. If Cudahy had by then acquired the AAA Rules (which were not attached to the contract), her failure to object may have been based upon an expectation that the AAA tribunal would follow the procedure which it had established for the appointment of arbitrators. The appointment of the arbitrator by the AAA came in a letter to the parties without further input from either side, therefore in contravention of the procedures established by the Rules. The apparent confusion surrounding the application of the AAA's Rules for selection of the arbitrator denied Audrie Cudahy input regarding who would

decide her fate, and further reinforced the injustice now acquiesced in by this Court.

It is obvious that confusion abounds in this controversy—not to mention in the original agreement between appellant and respondent. Without an opportunity to present her claims and defenses at a single trial or for that matter at a legitimate arbitration proceeding, Audrie Cudahy is doomed to watch her rights and remedies dissolve in a series of incongruous judgments, awards and now opinions.

## II. *A Meeting of the Minds*

In district court Cudahy pursued her claim against Smith based upon the written contract with him to supervise the construction of her home. Following a district court evidentiary hearing [4] she found her-

4. Cudahy's uncontradicted unconflicting testimony was as follows:

"Q. Would you state your full name?
A. Audrie B. Cudahy.
Q. What is your formal education?
A. High school, college.
Q. Did you take any courses regarding architecture, design, or anything of homes?
A. No, sir.
Q. What knowledge you you have regarding architecture and construction of the homes?
A. Absolutely none.
Q. What discussion did you have with—did you know Mr. Jack Smith?
A. Yes, I do.
Q. Who is Jack Smith?
A. The architect that—
Q. What discussions did you have with Mr. Smith regarding his services for your home, your home that you intended to have built essentially?
A. What do you mean in regard to discussion?
Q. When you first decided to build a home, how did you decide on Mr. Smith to start with?
A. Well, the basic consideration, of course, was the amount of money that I had to spend. That was the primary concern.
Q. How much was that?
A. Fifty counting everything, everything, lot, house, everything.
Q. And so based upon that, how did you decide upon Mr. Smith?
A. He assured me that the house could be done for that amount of money.
Q. Did you give any idea of the type of home you wanted built?
A. Not really. I mean other than to say we had to stick with the budget limits and obviously inexpensively constructed house.

Q. Did you have any discussions with him regarding how the house was to be built, what, how the house was to be built?
A. Not really because I don't know anything about construction or architecture and I felt that's why I hired an architect so he could see what was done, what I wanted done.
Q. I hand you what has been marked as Defendant's Exhibit 1. I think we stipulated that's a contract that you and Mr. Smith signed, is that correct?
A. That is correct.
Q. And that's for the construction of your contemplated residence on Lot 6?
A. Yes.
Q. Looking at the provisions in that agreement, did you ever discuss any of those provisions with Mr. Smith?
A. No, I did not.
Q. And how did you—when was the first time you saw this agreement?
A. When I signed it.
Q. Had you ever—how long did you have to look at the contract, at that exhibit that you have?
A. I don't recall that I did.
Q. Have you reviewed that agreement, have you looked that over since then?
A. Yeah, I guess you can say I looked at it.
Q. Does that agreement essentially summarize your prior discussions with Mr. Smith and your agreement with him regarding the construction of your home and the design of it?
A. Well, I just don't understand this contract at all.
Q. Did Mr. Smith ever discuss with you the arbitration provision in there?
A. No.

self out of court and thrown into arbitration, the court below concluding that she was bound to separately arbitrate her claim against Smith, although both parties could nonetheless utilize the discovery process of the district court in preparing for their arbitration hearing.

In urging that Cudahy's claim should not be taken out of the court system, her attorney made explicit his contention that there had not been any meeting of the minds regarding the arbitration provision found in the agreement, and that the governing rules, not being attached to the contract or available to his client at the time the contract was signed should not be binding:

"MR. ROLZITTO: I understand that position. But I am just stating that this arbitration provision essentially does have serious impact upon the rights of the owner. And the contract law is pretty

Q. What discussion did Mr. Smith have with you regarding that contract at the time you signed it?

A. Well, I think he said that it was a standard, you know, form and never having been exposed to anything like this before, I assumed it was standard procedure.

. . . .

MR. ROLZITTO: That's true, Your Honor. Our position is in fact the original agreement is signed as Audrie has stated. But subsequent to that when the home was built on the second lot, the agreement was not amended nor was it even—nor the conduct of defense of the architect in this case did it conform with that agreement. So we have no—what I am saying, and this Court has held in other cases, that there can be an amendment to the Architect's contract or a contractor's contract by actions of the parties.

I am trying to show by the actions of the parties there was no amendment to that contract and subsequent actions on the part of the architect clearly show that he did not intend to comply with these provisions.

THE COURT: Well, and I think again that comes if he didn't comply with the agreement, that maybe comes into a matter if I order arbitration for the arbitrators to consider. But you are saying again that your position is that there isn't a contract, an agreement to arbitrate. Now, I will hear evidence on that point of whether there is an agreement to arbitrate. Objection sustained.

Q. (By Mr. Rolzitto) Do you have any knowledge of what the construction industrial arbitration rules are, Audrie?

A. Absolutely none.

Q. Were they ever discussed with you?

clear even in Idaho that the person entering into an agreement has to have an understanding what that agreement is.

"And in fact the arbitration provision in the contract provides for arbitration pursuant to the construction industry arbitration rules of the American Arbitration Association.

"It's our position these Rules were never indicated to the owner what these Rules are. In fact when I tried to get a copy of them from the State Law Library, they didn't have a copy of them. They got one from the Arbitration Association.

"There is no knowledge of what the arbitration procedures or rules were. Essentially for that reason we feel that the arbitration provision in the contract is too vague to enforce."

A. No.

Q. By the architect or anyone else?

A. No."

And, on cross-examination by Smith's attorney:

"Q. Did Mr. Smith forbid you to read the contract?

A. It was never discussed as to whether I should read it or not.

Q. My question is, did he forbid you to read the contract?

A. No, he didn't forbid me.

Q. Did he forbid you to take it and discuss it with an attorney for example?

A. That never came up.

Q. Did you read the contract?

A. Did I read it?

Q. Yes, ma'am.

A. I glanced over it, but it was all very complicated.

Q. Isn't it true, Miss Cudahy, that Mr. Smith did review at least some of the material of that contract with you?

A. Possibly reviewed the fact that he was to have complete control over the whole building of the house.

Q. Isn't it true that you had rather extended discussions in regard to his fee?

A. No, I wouldn't say it was extended. There were extended discussions.

Q. You did have such discussions, didn't you?

A. He told me what his fee was.

Q. So it's your testimony he never reviewed the provisions of that contract with you at all?

A. To my knowledge, no."

A few minutes later the trial court explained to counsel his view of the issue before him:

"THE COURT: Well, the question before me is, and under the statutes is, whether or not an agreement to arbitrate has been entered into between these parties. The statute is quite clear. It says on application of a party showing an agreement and the opposing party refusal to arbitrate, the Court shall order the parties to proceed with arbitration, but if the opposing party denies the existence of the agreement to arbitrate, the Court shall proceed summarily to the determination of the issues so raised and shall order arbitration if found for the moving party, otherwise, the application shall be denied. The statute says that's my function is to determine whether there is an agreement to arbitrate.

. . . .

"THE COURT: Well, and I think again that comes if he didn't comply with the agreement, that maybe comes into a matter if I order arbitration for the arbitrators to consider. But you are saying again that your position is that there isn't a contract, an agreement to arbitrate. Now, I will hear evidence on that point of whether there is an agreement to arbitrate."

After Cudahy's testimony was concluded, the trial court announced his ruling from the bench:

"THE COURT: Well, let the record show, Madam Clerk and Mr. Reporter, that I am going to order arbitration in this matter. Idaho Code 7–902 seems to me to make that an almost a mandatory obligation on my part.

"I am finding that there is an agreement to arbitrate, that this matter comes under the Uniform Arbitration Act of the State of Idaho. I believe under that Act that if the arbitrators do not act in a proper manner or there are some other matters that Miss Cudahy desires to bring to the Court, she has the right to do it as I understand the Uniform Arbitration Act.

"It seems to me that the matters to which she has testified are matters of whether or not the contract was performed and have nothing basically to do at this point with whether or not the agreement is void.

"Now, with respect to pre-trial discovery, I am concerned about that as Mr. Rolzitto points up, there are some problems in connection with that. And he advises me that there is some pre-trial discovery to be done yet.

"Now, it would seem to me I can take one of two actions. I can order in the arbitration that pre-trial discovery be permitted because this action is not—certainly not dismissed, it's only stayed until the arbitrators move. Or I can stay the arbitration until such time as the pre-trial discovery is completed. But I choose to order the arbitration, but, in the order direct that the pre-trial discovery is not stayed."

The order compelling arbitration was patterned as directed by the trial court and was entered on December 13, 1977. The court did not make any findings of fact or conclusions of law on the issue which it had tried, but made an order that it found the existence of a valid agreement to arbitrate "in the form of Article 8 of the Standard A.I.A. Ownership-Architect Agreement dated February 2, 1976." Said article 8 provides in full as follows:

"All claims, disputes and other matters in question between the parties to this Agreement, arising out of, or relating to this Agreement or the breach thereof, shall be decided by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association then obtaining unless the parties mutually agree otherwise. No arbitration, arising out of, or relating to this Agreement shall include, by consolidation, joinder or in any other manner, any additional party not a party to this Agreement except by written consent containing a specific reference to this Agreement and signed by all the parties hereto. Any consent to arbitration in-

volving an additional party or parties shall not constitute consent to arbitration of any dispute not described therein or with any party not named or described therein. This Agreement to arbitrate and any agreement to arbitrate with an additional party or parties duly consented to by the parties hereto shall be specifically enforceable under the prevailing arbitration law. In no event shall the demand for arbitration be made after the date when such dispute would be barred by the applicable statute of limitations. The award rendered by the arbitrators shall be final."

The trial court failed to discuss the contention that the Construction Industry Arbitration Rules of the AAA mentioned in article 8 were not attached to the Cudahy-Smith agreement, or that Cudahy (and likely Smith as well) had never seen them, and for certain had not discussed them.[5]

That Cudahy can be obligated by the arbitration clause which attempted to incorporate by reference rules promulgated by the AAA without ever having seen those rules or having had them made available to her is a questionable proposition in itself. The practice of incorporation of a document by reference to it in another document has encountered sporadic appellate review in Idaho. *See Hoffman v. S.V. Co.,* 102 Idaho 187, 628 P.2d 218 (1981); *Blumauer-Frank Drug Co. v. Young,* 30 Idaho 501, 167 P. 21 (1917). That doctrine generally allows the supplementation of one document by another in order to provide essential terms necessary for a valid contract. The case at bar,

however, presents an atypical situation involving the incorporation of a document unnecessary for the determination of an otherwise valid contract. The reference to arbitration proceedings in article 8 of the A.I.A. standard form contract between Cudahy and Smith was obviously designed as an architect's unilateral form—in which respect it is much like the ancient and now nearly totally discarded provision for obtaining a confessed judgment on a promissory note based upon the acquiescing statement of a person appointed solely for that purpose. If it is upheld, the clause would bind both parties to submit any dispute to the American Arbitration Association for resolution in accord with its construction industry rules. But the clause introduces extraneous terms unknown and unavailable to Cudahy, and more than likely to Smith as well. The validity of such a provision, also akin to an agreement that venue shall be in Florida, and applicable law shall be that of Massachusetts, is at least doubtful.

A recent California case involved substantially similar issues. In a dispute between two realtors regarding a real estate commission the parties apparently had agreed to abide by the by-laws of a local board of realtors. The by-laws, unattached, incorporated a provision imposing a duty to arbitrate. The court stated that "[a] secondary document becomes part of a contract as though recited verbatim when it is incorporated into the contract by reference *provided that the terms of the incorporated document are readily available to the other party." King v. Larsen Realty, Inc.,* 121

---

5. The trial court's order of December 13, 1977, is as follows:

"This matter came before the Court for hearing on JOHN R. SMITH's Motion to Compel Arbitration on Friday, December 2, 1977, at 9:00 a.m. AUDRIE B. CUDAHY and JOHN R. SMITH were present in person and were represented by their respective attorneys, Victor Rozzitto and Thomas B. Campion. The court has reviewed the briefs on file here and considered the oral testimony presented by Audrie B. Cudahy at said hearing and good cause appearing therefor;

"IT IS HEREBY ORDERED that this Court finds, pursuant to I.C. § 7–901 *et seq.,* that there is a valid agreement to arbitrate in

existence between Audrie B. Cudahy and John R. Smith in the form of Article 8 of the Standard A.I.A. Owner-Architect Agreement dated February 2, 1976.

"IT IS FURTHER ORDERED that the parties John R. Smith and Audrie B. Cudahy are hereby directed to proceed to arbitration of the dispute between them. All litigation of any and all issues between the parties Audrie B. Cudahy and John R. Smith is hereby stayed until completion of arbitration.

"IT IS FURTHER ORDERED that pretrial discovery between Audrie B. Cudahy and John R. Smith may proceed during the arbitration proceedings."

Cal.App.3d 349, 358, 175 Cal.Rptr. 226, 231 (Ct.App.1981) (emphasis added); *e.g., Williams Construction Co. v. Standard-Pacific Corp.,* 254 Cal.App.2d 442, 61 Cal.Rptr. 912, (Ct.App.1967); 17A C.J.S. Contracts § 299 (1963). In *Scotts Valley Fruit Exchange v. Growers Refrigeration Co.,* 81 Cal.App.2d 437, 184 P.2d 183, 189 (1947) (overruled on other grounds by *Hischemoeller v. National Ice & Cold Storage Co.,* 46 Cal.2d 318, 294 P.2d 433, 439 (1956)), the California Court of Appeals clarified the prerequisites for incorporation by reference of an extraneous document:

"For the terms of another document to be incorporated into the document executed by the parties the reference must be clear and unequivocal, the reference must be called to the attention of the other party and he must consent thereto, and the *terms of the incorporated document must be known or easily available to the contracting parties.*"

The California decisions are sound. The incorporated document must be known or easily available to the parties. In this case it was not. Cudahy's testimony at the December 2, 1977 evidentiary hearing establishes that she had no knowledge of the construction industry arbitration rules nor had Smith or anyone else attempted to explain them to her, or provide her with a copy. Furthermore, the unconflicting record demonstrates that the vast state law library did not possess a copy of the rules until Cudahy's counsel requested them sometime subsequent to the beginning of this litigation.

It is a travesty to obligate Cudahy to arbitrate in accordance with certain procedures of which she had no knowledge. Architects who foist upon their clients arbitration rules of the American Arbitration Association through an American Institute of Architects Standard Form Agreement should be, at the least, required to attach those rules to the contract.

III. *The Refusal to Allow a 60-Day Postponement*

The arbitration hearing did not become scheduled until October of 1978, at which time it was set for December 4, 1978, although arbitration had been ordered by the district court almost a year earlier. In November, the hearing was rescheduled from December 4 to December 5. By letter dated November 16, 1978, Cudahy's attorney requested a continuance of the arbitration hearing—almost three weeks prior to the scheduled hearing date. Appellant's unavailability (she and a minor child had been obliged to return to the Chicago area), financial difficulties, and family commitments were stated as reasons for the request. *Her attorney committed her therein to being present during the first week in February, 1979, a scant sixty days away.* The letter was addressed to the AAA tribunal office in Seattle, as per its rules, to Smith's attorney and also to Mr. Davis, the individual appointed as arbitrator by the AAA. There was no response from the tribunal, *and no objection from the adverse party.* Cudahy's counsel made a formal request for postponement which was dated December 4, 1978. When Mr. Davis arrived to conduct the hearing, the request for a postponement was again presented to Mr. Davis, but denied without a scintilla of reason or explanation. The arbitration hearing then turned into an ex parte presentation by Smith and his witnesses, and was followed by a terse, conclusory and totally unexplained decision simply denying all of Cudahy's claims against Smith, and denying also Smith's claims against Cudahy.

Although the Court's opinion recites with much accuracy the rescheduling by the AAA of the hearing from December 4th to December 5th, it fails to note that this was at the request of Mr. Davis, who must be considered as the hearing officer, since the district court had actually appointed the AAA (whose rules say that it is a tribunal and not an arbitrator). Mr. Davis, an attorney, had a conflict in his own schedule. Similarly, the Court is not wholly inaccurate in differentiating between the letter request of November 16th and the formal request of December 4th—other than that a perusal of the record shows that the AAA

tribunal is not founded on formality. Rules, yes, but formality no. Mr. Davis' request for a postponement was also in letter form, as was a notice from the AAA advising that Mr. Davis would act as the arbitrator. Another letter contained an important ruling of the AAA, one overlooked by Mr. Davis, by the trial court, and now by this Court. That ruling, found in the letter of September 19, 1978, stated:

> "The AAA, after reviewing the contentions of the parties, has determined that an issue as to arbitrability exists *which could be* determined by an Arbitrator." (Emphasis added.)

The "decision" of Mr. Davis would not satisfy the formalistic requirements of the Idaho judicial system. Bluntly put, Cudahy's counsel will clearly see the Court as flavoring its opinion to show a timely request as untimely.

After the award was announced, Cudahy sought an order vacating it and Smith sought an order confirming. In the appeal record, R. at 247, is the brief of Smith's counsel, Mr. Campion, which clearly and to the point accepts that a postponement was sought by Mr. Rolzitto's letter of November 16th on behalf of Mrs. Cudahy. Does he contend that it was inadequate? No, and on the contrary, asserts having knowledge that Mr. Davis denied it—"by telephone" if you please. R. at 249. Formality obviously was not required. Mr. Campion states therein that "[a] further letter ... dated November 30, 1978, reiterated that Mrs. Cudahy would not be available ...," again added that "Mr. Davis informed counsel that the hearing would not be postponed"—but not declaring how this information was passed on, or complaining of any supposed informality. R. at 249.

It would unduly lengthen an already long opinion to set forth the argument of that trial court brief, and it should suffice to merely lay out the fact that it made no contention of Smith having filed any objection to the requested postponement—nor did it contend that Smith had claimed any prejudice which would befall him if Mrs. Cudahy were to have had the sixty-day delay which she sought. His best shot in his after-the-fact brief in district court is the unsupported statement that "Cudahy had ample notice and opportunity to arrange to attend the hearing." R. at 251. However, her uncontradicted affidavit, which was attached to Smith's brief showed otherwise:

> "AUDRIE B. CUDAHY, being first duly sworn, states under oath that she is the respondent in the above-captioned arbitration and that she is making this affidavit in support of her motion for a continuance of the hearing scheduled December 5, 1978, and in support of said motion states as follows:
>
> "1. That the affiant has recently moved from Ketchum, Idaho to Winnetka, Illinois, where she now maintains an apartment for herself and her child who requires attention and cannot be left alone so that it is impossible for the affiant to attend the hearing on December 5, 1978.
>
> "2. The affiant is presently engaged in efforts to locate employment as she is not now employed, and is therefore unable to afford the expense of a trip to Idaho to attend a hearing on December 5, 1978.
>
> "3. That the affiant believes that after she has located employment and has income that it will be possible for her to arrange for care for her child and pay expenses of travel to attend the arbitration of this matter at a later date.
>
> "4. That it would work an undue hardship upon her to be compelled to attend a hearing before convenient arrangements can be made for the care of her child and before she has gainful employment.
>
> "5. That the affiant knows of no prejudice to the claimant which will result if the hearing in this matter is postponed until a time when it will not unfairly prejudice her."

To vacate an arbitration award requires proof that "[t]he arbitrators refused to postpone the hearing upon sufficient cause being shown therefor ...." I.C. § 7–

912(a)(4). Thus, the question is whether "sufficient cause" to justify a continuance was shown by appellant. Historically this has always included the issue of prejudice to the other party. For reasons hereinafter set forth, I am unable to find any substance in the Court's opinion which upholds the denial of the requested postponement, and am mystified, amazed, and appalled at the summary manner in which the Court places its due process stamp of approval on such conduct.

As an alternative to the judicial process, *Thorgaard Plumbing & Heating Co. v. County of King,* 71 Wash.2d 126, 426 P.2d 828 (1967); *Staklinski v. Pyramid Electric Co.,* 6 App.Div.2d 565, 180 N.Y.S.2d 20 (1958), arbitration de-emphasizes many procedural formalities in favor of a time and money-saving system of effective conflict resolution. *Thorgaard, supra; Layne-Minnesota Co. v. Regents of University of Minnesota,* 266 Minn. 284, 123 N.W.2d 371 (1963); *Pacific Vegetable Oil Corp. v. C.S.T. Ltd.,* 29 Cal.2d 228, 174 P.2d 441 (1946); 5 Am.Jur.2d, Arbitration and Award, § 1 (1962). Although not universally applicable, certain types of conflicts are particularly amenable to the arbitration process. Notwithstanding its isolation from the judicial process, it is imperative that arbitration proceedings adequately protect the substantive and procedural rights of the parties involved. *Tombs v. Northwest Airlines, Inc.,* 83 Wash.2d 157, 516 P.2d 1028 (1973). In order to ensure that this protection is enforced, the legislature has seen fit to incorporate provisions allowing for judicial review within the Idaho Uniform Arbitration Act, I.C. §§ 7–901—7–922 (1979). (I.C. § 7–912, Vacating an award; I.C. § 7–913, Modification or corrections of award; I.C. § 7–919, Appeals.) Regardless of judicial supervision it is incumbent upon those in charge of conducting arbitration proceedings to maintain a degree of fairness at least equal to that which is found in a formal court of law.

Any judge in Idaho, given a two-week notification that a party was unavailable for a hearing because of financial and family difficulties, would order a continuance save for considerations of undue prejudice or intentional dilatory tactics, neither of which were raised by Smith.[6] As a matter of reciprocity, Smith had been allowed an order setting aside a default judgment against him, and was thus given his day in court, undoubtedly because of the judge's deference to Smith's due process right to present his side of the dispute prior to resolution. Denial of the right to be heard is allowed only in the most extraordinary cases. *See North Georgia Finishing Co. v. Di-Chem, Inc.,* 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975); *Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556, *reh'g denied,* 409 U.S. 902, 93 S.Ct. 177, 34 L.Ed.2d 165 (1972); *Sniadach v. Family Finance Corp.,* 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969); *Nettleton v. Higginson,* 98 Idaho 87, 558 P.2d 1048 (1977); *accord, Mitchell v. W.T. Grant Co.,* 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974). In the case at bar, the arbitrator's denial of appellant's request for a continuance effectively deprived her of any opportunity to be heard. If arbitration hearings are to accommodate individuals seeking a viable, efficient means of conflict resolution, fair play and impartiality must be the rule and not the exception. Can this Court condone an action by an arbitrator which so substantially violates the rights of one of the parties involved, *i.e.,* the right to be heard at the arbitration hearing? Until today, I would have thought not.

IV. *The Complexity Issue*

Because it is said to have been untimely made, the Court refuses to consider Cudahy's further argument that the complexity of the action precludes arbitration where other parties to the action cannot be compelled to arbitrate or be bound by the arbitration decision. Although the argument does not appear to have been made until

---

**6.** The unfairness of the arbitrator's refusal to allow a postponement is compounded by the fact that the AAA did not comply with its own Rules, thereby denying Cudahy the right to have a voice in the selection of the arbitrator. *See* part I, *supra.*

Cudahy's Motion for Reconsideration of the Order Confirming the Arbitration Award, I do not believe the Court is justified in side-stepping such an important issue. The record is clear that arbitrability was sought to be raised in the district court, who punted to the AAA tribunal—who did rule that it was an issue—yet never passed on it. The cases of this Court are legion where it has passed on issues which were raised in the trial court, a recent example of which is *Haeg v. City of Pocatello,* 98 Idaho 315, 563 P.2d 39 (1977). On the contrary, the Court properly refuses to hear an issue not raised in the trial court, and sought to be raised for the first time on appeal. Not this case.

Several courts have had the opportunity to examine the issues presented by an arbitration agreement in the context of multi-party litigation. In *Prestressed Concrete, Inc. v. Adolfson & Peterson, Inc.,* 308 Minn. 20, 240 N.W.2d 551 (1976), the Minnesota Supreme Court, noting the majority rule that arbitration is generally encouraged as an alternative to a judicial tribunal, *Ford Motor Co. v. M/S Maria Gorthon,* 397 F.Supp. 1332 (D.Md.1975); *Leeward Bus Co. v. City and County of Honolulu,* 58 Haw. 64, 564 P.2d 445 (1977), further recognized that this dictate must frequently be considered in light of the equally favored position of promoting "the efficient and expeditious resolution of controversies by facilitating joinder of all related parties and claims." 240 N.W.2d at 553. *E.g., Jefferson County v. Barton-Douglas Contractors,* 282 N.W.2d 155 (Iowa 1979). The purpose of joinder of parties and claims and consolidation of trials is to avoid multiplicity of actions and unnecessary duplication of efforts by courts and litigants. *See Branom v. Smith Frozen Foods of Idaho, Inc.,* 83 Idaho 502, 365 P.2d 958 (1961); *Nelson v. Inland Motor Freight Co.,* 60 Idaho 443, 92 P.2d 790 (1939).

The court in *Prestressed Concrete, supra,* faced with a fact situation similar to the case at bar, isolated the following factors as a foundation for their decision: (1) all the parties involved could not be compelled to arbitrate; (2) issues involved in the principal action were not subject to arbitration; (3) indemnification of the third-party plaintiff by the third-party defendant was unavailable until a determination of liability in the initial action had occurred; (4) the third party's co-defendants were not subject to arbitration; (5) the arbitration award could not bind the majority of the parties; and (6) the indemnity claim by the third-party plaintiff against the third-party defendant did not arise out of a contractual indemnity clause. 240 N.W.2d at 553; *contra Hamilton Life Insurance Co. v. Republic National Life Insurance Co.,* 408 F.2d 606 (2d Cir. 1969); *Martin K. Eby Construction Co. v. City of Arvada, Colo.,* 522 F.Supp. 449 (D.Colo.1981). Following consideration of the six factors the Minnesota court concluded that:

> "The basis for the favored status which arbitration usually enjoys in this court—that it generally expedites the settlement of disputes simply, clearly, and inexpensively—just is not present in this case. Where arbitration would increase rather than decrease delay, complexity, and costs, it should not receive favored treatment." 240 N.W.2d at 553.

Without question the parties represented in this appeal are involved in a complex multi-claim dispute involving several other parties, none of whom can be compelled to arbitrate their claim. The underlying issue involved in the main action concerns liability for remaining construction costs required for the completion of appellant's house. Although appellant Cudahy has stated several causes of action in her third-party claim against respondent Smith, it is unlikely he will be found liable to her unless a determination is made in the main action that she is responsible for the completion costs. Ronald W. Liese & Associates Insurance, Inc. and United Pacific Insurance Co., the third-party co-defendants are not subject to the arbitration. Nor can Loomis, Inc. or Ronald W. Liese be bound by the arbitration decision.

Other courts have focused on the potential for inconsistent results presented by arbitration decisions affecting issues in

multi-party litigation. *J.F. Inc. v. Vicik,* 99 Ill.App.3d 815, 55 Ill.Dec. 282, 426 N.E.2d 257 (1981); *Jefferson County, supra.* The *Vicik* court, realizing that multi-party actions involving intermingling claims and relationships among the parties are particularly amenable to inconsistent determinations, decided that policies favoring joinder outweighed policies favoring arbitration. 426 N.E.2d at 261; *see Jefferson County, supra.* The hesitancy towards inconsistent results can be justified on the basis of judicial economy or prejudice to the parties involved in the dispute. The latter is particularly germane in the present situation.

Following our reversal of the summary judgment order by the district court against appellant Cudahy, *Loomis v. Cudahy,* 101 Idaho 459, 615 P.2d 128 (1980), and pending our decision in this instance, the trial court bifurcated the *Loomis-Cudahy* trial from the third-party actions, over Cudahy's objection. The trial court therefore, effectively eliminated appellant's defense to Loomis' claims based upon respondent's liability. Loss of her defense against Loomis forced her to settle the claim out of court. Appellant's claim against respondent Smith is precluded by the majority's decision today. Her only remaining potential relief is from Liese & Associates or United Pacific. Mr. Liese, however, has recently filed bankruptcy in Montana and I would be surprised to find Liese & Associates in a much better position. It is apparent that Audrie Cudahy's avenues of relief are rapidly dwindling. Had the district court originally denied arbitration based upon the need for one multi-party trial, it is likely the entire dispute would have been resolved several years ago. Certainly, it is impossible to second-guess in retrospect what outcome might have occurred if a different course had been charted earlier in the litigation. My only purpose, however, is to indicate the amount of prejudice appellant has encountered by the district court's action.

The complexity and the inextricable nature of the claims involved in this dispute mandates *complete* adjudication of the case by a court of law. It is my view that the arbitration award should be vacated and the issues between Audrie Cudahy and John Smith be decided in district court contemporaneously with all claims, counter-claims, and cross-claims.

I respectfully dissent.

## APPENDIX

Appended hereto is a copy of the Construction Industry Arbitration Rules of the AAA. Hopefully, availability of these rules may be of some assistance in understanding why my views do not coincide with those of the Court. At the least, for those who might sign contracts containing a provision to submit otherwise judicial controversies to the AAA tribunal, there will be some access to the applicable rules—none of which were available to Audrie Cudahy when Smith obtained her signature to an AAA printed form contract which made reference to arbitration.

## AMERICAN ARBITRATION ASSOCIATION

Arbitration is the voluntary submission of a dispute to a disinterested person or persons for final determination. And to achieve orderly, economical and expeditious arbitration, in accordance with federal and state laws, the American Arbitration Association is available to administer arbitration cases under various specialized rules.

The American Arbitration Association maintains throughout the United States a National Panel of Arbitrators consisting of experts in all trades and professions. By arranging for arbitration under the Construction Industry Arbitration Rules, parties may obtain the services of arbitrators who are familiar with the construction industry.

The American Arbitration Association shall establish and maintain as members of its National Panel of Arbitrators individuals competent to hear and determine disputes administered under the Construction Industry Arbitration Rules. The Association shall consider for appointment to the Construction Industry Panel persons recommended by the Construction Industry Na-

tional Committee as qualified to serve by virtue of their experience in the construction field.

*The Association does not act as arbitrator.* Its function is to administer arbitrations in accordance with the agreement of the parties and to maintain Panels from which arbitrators may be chosen by parties. Once designated, the arbitrator decides the issues and an award is final and binding.

When an agreement to arbitrate is written into a construction contract, it may expedite peaceful settlement without the necessity of going to arbitration at all. Thus, the arbitration clause is a form of insurance against loss of good will.

## CONSTRUCTION INDUSTRY ARBITRATION RULES

Section 1. AGREEMENT OF PARTIES—The parties shall be deemed to have made these Rules a part of their arbitration agreement whenever they have provided for arbitration under the Construction Industry Arbitration Rules. These Rules and any amendment thereof shall apply in the form obtaining at the time the arbitration is initiated.

Section 2. NAME OF TRIBUNAL— Any Tribunal constituted by the parties for the settlement of their dispute under these Rules shall be called the Construction Industry Arbitration Tribunal, hereinafter called the Tribunal.

Section 3. ADMINISTRATOR—When parties agree to arbitrate under these Rules, or when they provide for arbitration by the American Arbitration Association, hereinafter called AAA, and an arbitration is initiated hereunder, they thereby constitute AAA the administrator of the arbitration. The authority and duties of the administrator are prescribed in the agreement of the parties and in these Rules.

Section 4. DELEGATION OF DUTIES—The duties of the AAA under these Rules may be carried out through Tribunal Administrators, or such other officers or committees as the AAA may direct.

Section 5. NATIONAL PANEL OF ARBITRATORS—In cooperation with the Construction Industry Arbitration Committee, the AAA shall establish and maintain a National Panel of Construction Arbitrators, hereinafter called the Panel, and shall appoint an arbitrator or arbitrators therefrom as hereinafter provided. A neutral arbitrator selected by mutual choice of both parties or their appointees, or appointed by the AAA, is hereinafter called the arbitrator, whereas an arbitrator selected unilaterally by one party is hereinafter called the party-appointed arbitrator. The term arbitrator may hereinafter be used to refer to one arbitrator or to a Tribunal of multiple arbitrators.

Section 6. OFFICE OF TRIBUNAL— The general office of a Tribunal is the headquarters of the AAA, which may, however, assign the administration of an arbitration to any of its Regional Offices.

Section 7. INITIATION UNDER AN ARBITRATION PROVISION IN A CONTRACT—Arbitration under an arbitration provision in a contract shall be initiated in the following manner:

The initiating party shall, within the time specified by the contract, if any, file with the other party a notice of an intention to arbitrate (Demand), which notice shall contain a statement setting forth the nature of the dispute, the amount involved, if any, and the remedy sought; and shall file two copies of said notice with any Regional Office of the AAA, together with two copies of the arbitration provisions of the contract and the appropriate filing fee as provided in Section 48 hereunder.

The AAA shall give notice of such filing to the other party. A party upon whom the demand for arbitration is made may file an answering statement in duplicate with the AAA within seven days after notice from the AAA, simultaneously sending a copy to the other party. If a monetary claim is made in the answer the appropriate administrative fee provided in the Fee Schedule shall be forwarded to the AAA with the answer. If no answer is filed within the stated time, it will be treated as a denial of

the claim. Failure to file an answer shall not operate to delay the arbitration.

Section 8. CHANGE OF CLAIM OR COUNTERCLAIM—After filing of the claim or counterclaim, if either party desires to make any new or different claim or counterclaim, same shall be made in writing and filed with the AAA, and a copy thereof shall be mailed to the other party who shall have a period of seven days from the date of such mailing within which to file an answer with the AAA. However, after the arbitrator is appointed no new or different claim or counterclaim may be submitted without the arbitrator's consent.

Section 9. INITIATION UNDER A SUBMISSION—Parties to any existing dispute may commence an arbitration under these Rules by filing at any Regional Office two (2) copies of a written agreement to arbitrate under these Rules (Submission), signed by the parties. It shall contain a statement of the matter in dispute, the amount of money involved, if any, and the remedy sought, together with the appropriate filing fee as provided in the Fee Schedule.

Section 10. PRE–HEARING CONFERENCE—At the request of the parties or at the discretion of the AAA a pre-hearing conference with the administrator and the parties or their counsel will be scheduled in appropriate cases to arrange for an exchange of information and the stipulation of uncontested facts so as to expedite the arbitration proceedings.

Section 11. FIXING OF LOCALE—The parties may mutually agree on the locale where the arbitration is to be held. If any party requests that the hearing be held in a specific locale and the other party files no objection thereto within seven days after notice of the request is mailed to such party, the locale shall be the one requested. If a party objects to the locale requested by the other party, the AAA shall have power to determine the locale and its decision shall be final and binding.

Section 12. QUALIFICATIONS OF ARBITRATOR—Any arbitrator appointed pursuant to Section 13 or Section 15 shall be neutral, subject to disqualification for the reasons specified in Section 19. If the agreement of the parties names an arbitrator or specifies any other method of appointing an arbitrator, or if the parties specifically agree in writing, such arbitrator shall not be subject to disqualification for said reasons.

Section 13. APPOINTMENT FROM PANEL—If the parties have not appointed an arbitrator and have not provided any other method of appointment, the arbitrator shall be appointed in the following manner: Immediately after the filing of the Demand or Submission, the AAA shall submit simultaneously to each party to the dispute an identical list of names of persons chosen from the Panel. Each party to the dispute shall have seven days from the mailing date in which to cross off any names to which it objects, number the remaining names indicating the order of preference, and return the list to the AAA. If a party does not return the list within the time specified, all persons named therein shall be deemed acceptable. From among the persons who have been approved on both lists, and in accordance with the designated order of mutual preference, the AAA shall invite the acceptance of an arbitrator to serve. If the parties fail to agree upon any of the persons named, or if acceptable arbitrators are unable to act, or if for any other reason the appointment cannot be made from the submitted lists, the AAA shall have the power to make the appointment from other members of the Panel without the submission of any additional lists.

Section 14. DIRECT APPOINTMENT BY PARTIES—If the agreement of the parties names an arbitrator or specifies a method of appointing an arbitrator, that designation or method shall be followed. The notice of appointment, with name and address of such arbitrator, shall be filed with the AAA by the appointing party. Upon the request of any such appointing party, the AAA shall submit a list of members from the Panel from which the party may make the appointment.

If the agreement specifies a period of time within which an arbitrator shall be appointed, and any party fails to make such appointment within that period, the AAA shall make the appointment.

If no period of time is specified in the agreement, the AAA shall notify the parties to make the appointment and if within seven days after mailing of such notice such arbitrator has not been so appointed, the AAA shall make the appointment.

Section 15. APPOINTMENT OF ARBITRATOR BY PARTY–APPOINTED ARBITRATORS—If the parties have appointed their party-appointed arbitrators or if either or both of them have been appointed as provided in Section 14, and have authorized such arbitrator to appoint and arbitrator within a specified time and no appointment is made within such time or any agreed extension thereof, the AAA shall appoint an arbitrator who shall act as Chairperson.

If no period of time is specified for appointment of the third arbitrator and the party-appointed arbitrators do not make the appointment within seven days from the date of the appointment of the last party-appointed arbitrator, the AAA shall appoint the arbitrator who shall act as Chairperson.

If the parties have agreed that their party-appointed arbitrators shall appoint the arbitrator from the Panel, the AAA shall furnish to the party-appointed arbitrators, in the manner prescribed in Section 13, a list selected from the Panel, and the appointment of the arbitrator shall be made as prescribed in such Section.

Section 16. NATIONALITY OF ARBITRATOR IN INTERNATIONAL ARBITRATION—If one of the parties is a national or resident of a country other than the United States, the arbitrator shall, upon the request of either party, be appointed from among the nationals of a country other than that of any of the parties.

Section 17. NUMBER OF ARBITRATORS—If the arbitration agreement does not specify or the parties are unable to agree as to the number of arbitrators, the dispute shall be heard and determined by three arbitrators, unless the AAA, in its discretion, directs that a single arbitrator or a greater number of arbitrators be appointed.

Section 18. NOTICE OF ARBITRATOR OF APPOINTMENT—Notice of the appointment of the arbitrator, whether mutually appointed by the parties or by the AAA, shall be mailed to the arbitrator by the AAA, together with a copy of these Rules, and the signed acceptance of the arbitrator shall be filed prior to the opening of the first hearing.

Section 19. DISCLOSURE AND CHALLENGE PROCEDURE—A person appointed as neutral arbitrator shall disclose to the AAA any circumstances likely to affect his or her impartiality, including any bias or any financial or personal interest in the result of the arbitration or any past or present relationship with the parties or their counsel. Upon receipt of such information from such arbitrator or other source, the AAA shall communicate such information to the parties, and, if it deems it appropriate to do so, to the arbitrator and others. Thereafter, the AAA shall determine whether the arbitrator should be disqualified and shall inform the parties of its decision, which shall be conclusive.

Section 20. VACANCIES—If any arbitrator should resign, die, withdraw, refuse, be disqualified or be unable to perform the duties of office, the AAA shall, on proof satisfactory to it, declare the office vacant. Vacancies shall be filled in accordance with the applicable provisions of these Rules and the matter shall be reheard unless the parties shall agree otherwise.

Section 21. TIME AND PLACE—The arbitrator shall fix the time and place for each hearing. The AAA shall mail to each party notice thereof at least five days in advance, unless the parties by mutual agreement waive such notice or modify the terms thereof.

Section 22. REPRESENTATION BY COUNSEL—Any party may be represented by counsel. A party intending to be so

represented shall notify the other party and the AAA of the name and address of counsel at least three days prior to the date set for the hearing at which counsel is first to appear. When an arbitration is initiated by counsel, or where an attorney replies for the other party, such notice is deemed to have been given.

Section 23. STENOGRAPHIC RECORD—The AAA shall make the necessary arrangements for the taking of a stenographic record whenever such record is requested by a party. The requesting party or parties shall pay the cost of such record as provided in Section 50.

Section 24. INTERPRETER—The AA shall make the necessary arrangements for the services of an interpreter upon the request of one or both parties, who shall assume the cost of such services.

Section 25. ATTENDANCE AT HEARINGS—Persons having a direct interest in the arbitration are entitled to attend hearings. The arbitrator shall otherwise have the power to require the retirement of any witness or witnesses during the testimony of other witnesses. It shall be discretionary with the arbitrator to determine the propriety of the attendance of any other persons.

Section 26. ADJOURNMENTS—The arbitrator may adjourn the hearing, and must take such adjournment when all of the parties agree thereto.

Section 27. OATHS—Before proceeding with the first hearing or with the examination of the file, each arbitrator may take an oath of office, and if required by law, shall do so. The arbitrator may require witnesses to testify under oath administered by any duly qualified person or, if required by law or demanded by either party, shall do so.

Section 28. MAJORITY DECISION—Whenever there is more than one arbitrator, all decisions of the arbitrators must be by at least a majority. The award must also be made by at least a majority unless the concurrence of all is expressly required by the arbitration agreement or by law.

Section 29. ORDER OF PROCEEDINGS—A hearing shall be opened by the filing of the oath of the arbitrator, where required, and by the recording of the place, time and date of the hearing, the presence of the arbitrator and parties, and counsel, if any, and by the receipt by the arbitrator of the statement of the claim and answer, if any.

The arbitrator may, at the beginning of the hearing, ask for statements clarifying the issues involved.

The complaining party shall then present its claims, proofs and witnesses, who shall submit to questions or other examination. The defending party shall then present its defenses, proofs and witnesses, who shall submit to questions or other examination. The arbitrator may vary this procedure but shall afford full and equal opportunity to the parties for the presentation of any material or relevant proofs.

Exhibits, when offered by either party, may be received in evidence by the arbitrator.

The names and addresses of all witnesses and exhibits in order received shall be made a part of the record.

Section 30. ARBITRATION IN THE ABSENCE OF A PARTY—Unless the law provides to the contrary, the arbitration may proceed in the absence of any party, who, after due notice, fails to be present or fails to obtain an adjournment. An award shall not be made solely on the default of a party. The arbitrator shall require the party who is present to submit such evidence as deemed necessary for the making of an award.

Section 31. EVIDENCE—The parties may offer such evidence as they desire and shall produce such additional evidence as the arbitrator may deem necessary to an understanding and determination of the dispute. An arbitrator authorized by law to subpoena witnesses or documents may do so upon the request of any party or independently. The arbitrator shall be the judge of the admissibility of the evidence offered

and conformity to legal rules of evidence shall not be necessary. All evidence shall be taken in the presence of all of the arbitrators and all of the parties, except where any of the parties is absent in default or has waived his or her right to be present.

Section 32. EVIDENCE BY AFFIDAVIT AND FILING OF DOCUMENTS— The arbitrator may receive and consider the evidence of witnesses by affidavit, giving it such weight as seems appropriate after consideration of any objections made to its admission.

All documents not filed with the arbitrator at the hearing, but arranged for at the hearing or subsequently by agreement of the parties, shall be filed with the AAA for transmission to the arbitrator. All parties shall be afforded opportunity to examine such documents.

Section 33. INSPECTION OR INVESTIGATION—An arbitrator finding it necessary to make an inspection or investigation in connection with the arbitration, shall direct the AAA to so advise the parties. The arbitrator shall set the time and the AAA shall notify the parties thereof. Any party who so desires may be present at such inspection or investigation. In the event that one or both parties are not present at the inspection or investigation, the arbitrator shall make a verbal or written report to the parties and afford them an opportunity to comment.

Section 34. CONSERVATION OF PROPERTY—The arbitrator may issue such orders as may be deemed necessary to safeguard the property which is the subject matter of the arbitration without prejudice to the rights of the parties or to the final determination of the dispute.

Section 35. CLOSING OF HEARINGS—The arbitrator shall specifically inquire of the parties whether they have any further proofs to offer or witnesses to be heard. Upon receiving negative replies, the arbitrator shall declare the hearings closed and a minute thereof shall be recorded. If briefs are to be filed, the hearings shall be declared closed as of the final date set by the arbitrator for the receipt of briefs. If documents are to be filed as provided for in Section 32 and the date set for their receipt is later than that set for the receipt of briefs, the later date shall be the date of closing the hearing. The time limit within which the arbitrator is required to make an award shall commence to run, in the absence of other agreements by the parties, upon the closing of the hearings.

Section 36. REOPENING OF HEARINGS—The hearings may be reopened by the arbitrator at will, or upon application of a party at any time before the award is made. If the reopening of the hearing would prevent the making of the award within the specific time agreed upon by the parties in the contract out of which the controversy has arisen, the matter may not be reopened, unless the parties agree upon the extension of such time limit. When no specific date is fixed in the contract, the arbitrator may reopen the hearings, and the arbitrator shall have thirty days from the closing of the reopened hearings within which to make an award.

Section 37. WAIVER OF ORAL HEARINGS—The parties may provide, by written agreement, for the waiver of oral hearings. If the parties are unable to agree as to the procedure, the AAA shall specify a fair and equitable procedure.

Section 38. WAIVER OF RULES—Any party who proceeds with the arbitration after knowledge that any provision or requirement of these Rules has not been complied with and who fails to state an objection thereto in writing, shall be deemed to have waived the right to object.

Section 39. EXTENSIONS OF TIME— The parties may modify any period of time by mutual agreement. The AAA for good cause may extend any period of time established by these Rules, except the time for making the award. The AAA shall notify the parties of any such extension of time and its reason therefor.

Section 40. COMMUNICATION WITH ARBITRATOR AND SERVING OF NO-

TICES—There shall be no communication between the parties and an arbitrator other than at oral hearings. Any other oral or written communications from the parties to the arbitrator shall be directed to the AAA for transmittal to the arbitrator.

Each party to an agreement which provides for arbitration under these Rules shall be deemed to have consented that any papers, notices or process necessary or proper for the initiation or continuation of an arbitration under these Rules and for any court action in connection therewith or for the entry of judgment on any award made thereunder may be served upon such party by mail addressed to such party or its attorney at the last known address or by personal service, within or without the state wherein the arbitration is to be held (whether such party be within or without the United States of America), provided that reasonable opportunity to be heard with regard thereto has been granted such party.

Section 41. TIME OF AWARD—The award shall be made promptly by the arbitrator and, unless otherwise agreed by the parties, or specified by law, not later than thirty days from the date of closing the hearings, or if oral hearings have been waived, from the date of transmitting the final statements and proofs to the arbitrator.

Section 42. FORM OF AWARD—The award shall be in writing and shall be signed either by the sole arbitrator or by at least a majority if there be more than one. It shall be executed in the manner required by law.

Section 43. SCOPE OF AWARD—The arbitrator may grant any remedy or relief which is just and equitable and within the terms of the agreement of the parties. The arbitrator, in the award, shall assess arbitration fees and expenses as provided in Sections 48 and 50 equally or in favor of any party and, in the event any administrative fees or expenses are due the AAA, in favor of the AAA.

Section 44. AWARD UPON SETTLEMENT—If the parties settle their dispute during the course of the arbitration, the arbitrator, upon their request, may set forth the terms of the agreed settlement in an award.

Section 45. DELIVERY OF AWARD TO PARTIES—Parties shall accept as legal delivery of the award the placing of the award or a true copy thereof in the mail by the AAA, addressed to such party or its attorney at the last known address or by personal service, within or without the state wherein the arbitration is to be held (whether such party be within or without the United States of America), provided that reasonable opportunity to be heard with regard thereto has been granted such party.

Section 46. RELEASE OF DOCUMENTS FOR JUDICIAL PROCEEDINGS—The AAA shall, upon the written request of a party, furnish to such party, at its expense, certified facsimiles of any papers in the AAA's possession that may be required in judicial proceedings relating to the arbitration.

Section 47. APPLICATIONS TO COURT—No judicial proceedings by a party relating to the subject matter of the arbitration shall be deemed a waiver of the party's right to arbitrate.

The AAA is not a necessary party in judicial proceedings relating to the arbitration.

Parties to these Rules shall be deemed to have consented that judgment upon the award rendered by the arbitrator(s) may be entered in any Federal or State Court having jurisdiction thereof.

Section 48. ADMINISTRATIVE FEES—As a nonprofit organization, the AAA shall prescribe an administrative fee schedule and a refund schedule to compensate it for the cost of providing administrative services. The schedule in effect at the time of filing or the time of refund shall be applicable.

The administrative fees shall be advanced by the initiating party or parties in accordance with the administrative fee schedule, subject to final apportionment by the arbitrator in the award.

When a matter is withdrawn or settled, the refund shall be made in accordance with the refund schedule.

The AAA, in the event of extreme hardship on the part of any party, may defer or reduce the administrative fee.

Section 49. FEE WHEN ORAL HEARINGS ARE WAIVED—Where all oral hearings are waived under Section 37 the Administrative Fee Schedule shall apply.

Section 50. EXPENSES—The expenses of witnesses for either side shall be paid by the party producing such witnesses.

The cost of the stenographic record, if any is made, and all transcripts thereof, shall be prorated equally between the parties ordering copies unless they shall otherwise agree and shall be paid for by the responsible parties directly to the reporting agency.

All other expenses of the arbitration, including required traveling and other expenses of the arbitrator and of AAA representatives, and the expenses of any witness or the cost of any proofs produced at the direct request of the arbitrator, shall be borne equally by the parties, unless they agree otherwise, or unless the arbitrator in the award assesses such expenses or any part thereof against any specified party or parties.

Section 51. ARBITRATOR'S FEE—Unless the parties agree to terms of compensation, members of the National Panel of Construction Arbitrators will serve without compensation for the first two days of service.

Thereafter, compensation shall be based upon the amount of service involved and the number of hearings. An appropriate daily rate and other arrangements will be discussed by the administrator with the parties and the arbitrator(s). If the parties fail to agree to the terms of compensation, an appropriate rate shall be established by the AAA, and communicated in writing to the parties.

Any arrangement for the compensation of an arbitrator shall be made through the AAA and not directly by the arbitrator with the parties. The terms of compensation of neutral arbitrators on a Tribunal shall be identical.

Section 52. DEPOSITS—The AAA may require the parties to deposit in advance such sums of money as it deems necessary to defray the expense of the arbitration, including the arbitrator's fee if any, and shall render an accounting to the parties and return any unexpended balance.

Section 53. INTERPRETATION AND APPLICATION OF RULES—The arbitrator shall interpret and apply these Rules insofar as they relate to the arbitrator's powers and duties. When there is more than one arbitrator and a difference arises among them concerning the meaning or application of any such Rules, it shall be decided by a majority vote. If that is unobtainable, either an arbitrator or a party may refer the question to the AAA for final decision. All other Rules shall be interpreted and applied by the AAA.